HENRY BEDLOW in his Own Right and as Administrator, etc., et al., Appellants, *v.* THE NEW YORK FLOATING DRY DOCK COMPANY, Respondent.

Exceptions to findings of fact, where they are unsupported by evidence, and to refusals to find, where they are established by undisputed proof, present questions of law reviewable in this court.

The lessees of wharf rights upon navigable waters of New York harbor cannot, as against their lessors and without their consent, during the existence of the lease, acquire an absolute right to occupy, by a permanent structure, the waters in front of said wharf to the destruction of its value and usefulness.

*It seems* the rights acquired by the city of New York under the Dongan and Montgomerie charters to the lands under water around the island of Manhattan did not give the city, as matter of legal right, unrestricted authority to erect such structures thereon as it sees fit.

The right of control over the navigable waters of the state is a legislative power and cannot be destroyed by any authority whatever, and the right of the People to use these natural public highways of the state cannot be taken away or seriously impaired by legislation.

The right of the city, therefore, to erect structures in navigable waters remains subject to the sovereign authority over such highways.

The history of legislation on this subject given.

The city has no authority to grant to others than the littoral owners rights and privileges in lands under water in front of their uplands, except in case of the neglect and refusal of such owners, after due notice, to comply with the terms lawfully prescribed by the city as the conditions of the grant.

All conveyances of lands under water made by the city after the act of 1798 (Chap. 80, Laws of 1798), must be deemed to have been taken subject

to its provisions, including the right to construct piers on the conditions mentioned therein.

Prior to 1806 R. and his ancestors had for many years owned and occupied a parcel of land in said city bounded on the south by high-water mark in the East river. In that year R. obtained from the city under the act of 1798 (Chap. 80, Laws of 1798), a conveyance of the land in front of his lot "between high and low-water mark." The conveyance, after giving the metes, described the land conveyed as "bounded southerly, in front, by the East river or harbor of the said city; northerly, in the rear, by the said lot of ground" belonging to R. "with the easements, profits, * * * appurtenances, etc., thereunto belonging." In consideration of the conveyance P. covenanted to and did build a wharf on the south side of the land conveyed, which was made part of a street extending along that portion of the harbor, and thereafter maintained the same. The deed contained a warranty upon the part of the city of peaceable and quiet possession in R., his heirs and assigns forever. The wharf, as built, extended sixteen feet into the harbor beyond the strip granted. This location of the south line was acquiesced in, and for more than fifty years constituted the southerly extension line of the city at that place. *Held*, that R. and his successors in interest, not only had title in fee to the wharf or street, but to all the lands lying between it and his original possession, with such water rights as pertained to the ownership of the wharf, including the right of unobstructed access thereto over the waters of the harbor, together with a pre-emptive right to any further grant of privileges in the water lying in front of such premises; among others the right to acquire the ownership of all piers or bridges thereafter required by the city to be built in front of such premises.

In 1834 the executors of R., under a power contained in his will, executed a lease of said premises with the "easement, profits, * * * appurtenances, * * * and particularly the wharf and water privileges" for twenty-one years, with a covenant for a renewal for another like term. The lessees and their grantees occupied during the two terms. In 1838, at the request of the lessees, the mayor and common council authorized a pier to be built from about the center of the said wharf or bulk-head, extending into the river, and on petition of said lessees who, as such, claimed the same rights as the owner of the soil, and expressed a willingness to build the pier at their own expense, permission was given them to build it, subject "to any and all such rights (if any) which the owners of the fee may at any time have in or to the same." The pier was accordingly built, and in 1848 the then owners of the lease-hold interest executed to defendant a conveyance of their interest in the bulk-head and water privileges acquired under the lease, and by a separate conveyance by warranty deed conveyed to it the pier with its appurtenances. At the termination of the lease defendant surrendered

possession of the demised premises, with the exception of the easement of access thereto over the waters, from the enjoyment of which plaintiffs, who had succeeded to the title of the lessor, were excluded by the pier of which defendant retained possession. In an action to recover possession of the pier and the water-ways appurtenant to the wharf, *held*, that the lessees acquired under the lease not only the use and enjoyment of the demised premises and of the easements connected therewith, but also the right to make all such improvements thereon or additions thereto as should contribute to their profitable employment which were not pro-hibited by the lease and did not constitute waste; and so they, and not the landlord, had the right, with the consent of the city, to build the pier and occupy it during the term; but that upon surrender of the demised premises the pier, as part thereof, reverted to the landlord, as the surrender by operation of law vested the landlord with the title thereto, it having become an accession to the wharf; also, that having obtained the right to construct the pier simply in their character as tenants, and so, representatives of the littoral owners, the lessees and their successors in interest were estopped from asserting any other right as against such owners.

The rule that the intent of the tenant in making an acquisition or inclosure must govern, has no application to an acquisition or inclosure made on the demised premises or an appurtenance thereof.

Also, *held*, that defendant could not claim title by adverse possession founded on its deed of the pier.

Where the relation of landlord and tenant has been once established, the possession of the latter and of his grantee is that of the landlord, and not hostile or adverse; and this is so where such grantee has taken a deed of the fee in ignorance of the fact that his grantor stood in the relation of tenant, the latter denying any such relation. The relation once established it attaches to all who may succeed to the possession under the tenant.

The presumption of possession of the tenant in subordination to the title of the landlord continues not only during the term, but for twenty years after its termination; and this, notwithstanding any claim of the tenant or his successors of a hostile title.

To initiate an adverse holding, the tenant must surrender possession to the landlord, or do something that is equivalent, and bring home to the landlord knowledge of the adverse claim.

*Bedlow* v. *N. Y. F. D. D. Co.* (44 Hun, 378) reversed.

(Argued December 12, 1888; decided January 22, 1889.

APPEAL from judgment of the General Term of the Supreme Court in the first judicial department, entered upon an order

made at the May Term, 1887, which affirmed a judgment in favor of defendant entered upon a decision of the court on trial at Special Term. (Reported below, 44 Hun, 378.)

The nature of the action and the material facts are stated in the opinion.

*Herbert B. Turner* for appellants. Henry Rutgers being the owner of the upland and the grantee of the city of land to low-water mark, his devisees had the right of riparian owners to built wharves and piers. (*Dutton* v. *Strong*, 1 Black. 23; *State* v. *Jersey City*, 1 Dutcher, 525; Montgomerie Charter [January 15, 1730]; State Constitutions of 1777, 1822, 1846; *Yates* v. *Milwaukee*, 10 Wall. 497; *Webber* v. *Harbor Masters*, 18 id. 64; Coke Litt. 48 b; 3 Kent's Com. 431; Laws of 1807, chap. 115, § 15; Laws of 1813, chap. 86, §§ 220, 221; *Whitney* v. *Mayor, etc.*, 6 Abb. N. C. 340; *Langdon* v. *Mayor, etc.*, 93 N. Y. 129; *Van Zandt* v. *Mayor, etc.*, 8 Bosw. 384; *Wetmore* v. *A. W. L. Co.*, 37 Barb. 94; *Wetmore* v. *B. G. L. Co.*, 42 N. Y. 388, 389; *Furman* v. *Mayor, etc.*, 5 Sandf. 16; 10 N. Y. 567.) Pearce and Stephenson, the lessees, acquired no rights except in that capacity, and the rights of their assignees terminated with the renewal of the lease. (*Andrew* v. *Hailes*, 2 E. & B. 349; *Kingsmill* v. *Millard*, 11 Exch. 313; *Doe* v. *Rees*, 6 C. & P. 610; *Doe* v. *Tidbury*, 14 C. B. 304; 1 Wash. on Real Prop. 357, *Dempsey* v. *Kipp*, 61 N. Y. 462, 470; *Verplank* v. *City of New York*, 2 Edw. 220; *Sands* v. *Hughes*, 53 N. Y. 293.) The assignee of a tenant cannot set up against the landlord, a title acquired during the tenancy, hostile in its character to the title which the tenant acknowledged in accepting the demise. (*Sharp* v. *Kelley*, 5 Denio, 431; *Henley* v. *Branch Bk.*, 16 Ala. 552.) The estoppel which binds the tenant, binds all who claim under or through them. (*Rose* v. *Davis*, 11 Cal. 143; *McCravey* v. *Remsen*, 19 Ala. 430; *Brown* v. *Kelley*, 32 Ill. 151; *Moshier* v. *Reding*, 12 Me. 478; *Stewart* v. *Roderick*, 4 W. & S. 188; *Lane* v. *Osment*, 9 Yerg. [Tenn.] 86; *Corning* v. *T. I. & N. Factory*, 34 Barb. 485.) The statute of limitations is no

defense. (*Sands* v. *Hughes*, 53 N. Y. 293; *Zellers* v. *Eckert*, 4 How. [U. S.] 295; *People* v. *Trinity Church*, 22 N. Y. 44; *Jackson* v. *Harsen*, 7 Conn. 323; *Whiting* v. *Edmunds*, 94 N. Y. 309; Code of Civ. Pro. § 373; 1 R. S. 739, §§ 143, 145; *Sparrows* v. *Kingman*, 1 N. Y. 247, 248; *Moore* v. *Little*, 41 id. 78.)

*Robert D. Benedict* and *Enos N. Taft* for respondent. A holding by a tenant is to be presumed to be for the benefit of the landlord under whom he holds the principal estate, unless the contrary is clearly proved. (1 Washburn's Real Property, 357.) This is very far from being a case of encroachment. Pearce acquired title to the land upon which the pier now stands, from the city — a third party — who was the owner in fee, and for the very large consideration of building and extending it. (*Williams* v. *Mayor, etc.*, 105 N. Y. 428, 429; *Earl of Lisburne* v. *Davies*, 1 L. R., C. P. 259.) The relation of landlord and tenant never existed, as respects the pier, between Pearce and the executors of Henry Rutgers or their successors. (*Sands* v. *Hughes*, 53 N. Y. 287, 294; *Despard* v. *Walbridge*, 15 id. 374, 377.) A grant of land by a sovereign, bounded by tide-water, limits the land conveyed to high-water mark. (*Gould* v. *H. R. R. R. Co.*, 6 N. Y. 522; *Langdon* v. *Mayor, etc.*, 93 id. 144.) The city was not prevented by the grant to Rutgers, from directing this pier to be built. In taking this grant, Rutgers placed himself in the very position of being made liable to submit to a direction by the common council that a pier should be built. (*Langdon* v. *Mayor, etc.*, 93 N. Y. 153; Montgomerie Charter, Davies' Laws, 193, 194; Act of April 3, 1798, Davies' Laws, 394, 398; Act of April 3, 1801, Davies' Laws, 403, 406; Act of April 2, 1806, Davies' Laws, 423–425; 2 Rev. Laws 1813, 556.) The assent of the city, alone, to the building of the pier by Pearce, was sufficient to give him the right to build the pier for himself, without affording any ground of complaint on the part of anyone claiming under Rutgers. (*Whitney* v. *Mayor, etc.*, 6 Abb. N. C. 329, 334;

Kent's Charter, 147; Hoffman's Treatise on Corp. 248; *Williams* v. *Mayor, etc.,* 105 N. Y. 427; Davies' Laws, 406, 558.)

Ruger Ch. J. In 1877, upon the termination of a lease, given originally in 1834 by the plaintiff's ancestors to the defendant's assignors, of lands lying on the East river in the city of New York, upon which was a wharf and bulk-head, the assignees of the original lease surrendered to the plaintiffs the demised premises, with the exception of an easement of access over the water of the harbor pertaining to the wharf. The property thus surrendered was then found by the plaintiffs to be substantially excluded from communication with the harbor by a pier attached to the wharf, thirty-five feet in breadth and upwards of three hundred feet in length extending into the river and, together with the space occupied by vessels and water craft lying at the pier for commercial and traffic purposes, effectually obstructing access to and egress from the water side and substantially destroying its value as a wharf. This action was brought after the expiration of the lease, against its assignees to recover possession of said pier and the water ways appurtenant to the wharf, and to obtain an accounting of rents, income and profits arising from the use of said pier subsequent to the expiration of the lease. The defendant resists the action upon the alleged ground that it is the lawful owner of the pier. The case presents the question whether the lessees of wharf rights upon navigable waters in New York harbor can, as against their lessors, during the existence of a lease, acquire an absolute right to occupy by a permanent structure the waters in front of such wharf to the destruction of its value and usefulness, without the consent and in defiance of the will of their lessors, and, if they can, whether they have done so in this case.

The questions involved, although treated generally by the trial court as questions of fact, depend mainly, if not altogether, upon the effect of statutes and ordinances relating to the subject, and the construction of certain conveyances and leases

and the rights, duties and disabilities of the respective parties thereunder. We have been unable to discover any question of fact, depending upon conflicting evidence in the case, and, indeed, the testimony is quite undisputed and leaves the questions therein to be determined mainly by the court as those of law and not of fact. Exceptions to alleged findings of fact, when they are unsupported by evidence, and to the refusals to find, when they are established by undisputed proof, present questions of law reviewable in this court. There are several such exceptions which will appear from the views we shall have occasion to express in the case, and they need not be more particularly referred to here. The undisputed evidence, both documentary and oral, shows that Henry Rutgers and his ancestors had for upwards of three-quarters of a century, previous to 1806, owned and occupied a parcel of land in said city, lying upon tide water in the East river, between Clinton and Montgomery streets, bounded on the south by high-water mark in the East river. Rutgers had, before 1806, succeeded to the ownership of this land and, in that year, obtained from the mayor, aldermen and commonalty of New York, under chapter 80 of the Laws of 1798, authorizing the granting of land on and in the East river for the purpose of building a street and bulk-head which should constitute an exterior line on the harbor, a conveyance in the following language, " a certain lot, piece or parcel of ground between high and low-water mark, situate, lying and being between Clinton street and Montgomery street in the Seventh ward of the city of New York, opposite to that part of the ground belonging to the said Henry Rutgers, distinguished by lot number six hundred and fifty-three, containing, in depth, on the west side, ninety-four feet, and on the east side sixty-eight feet, and in front on the East river, or harbor of the said city, ninety-two feet and six inches; bounded southerly, in front, by the East river, or harbor of the said city; northerly, in the rear, by the said lot of ground No. 653, belonging to the said Henry Rutgers, * * * together with all and singular the easements, profits, commodities, advantages, emoluments, heredita--

ments and appurtenances to the said lots, pieces or parcels of ground and premises above mentioned belonging or in anywise appertaining * * * unto the said Henry Rutgers, his heirs and assigns, to the only proper use, benefit and behoof of them, the said Henry Rutgers, his heirs and assigns forever."

In consideration of this conveyance Rutgers covenanted to build, erect and make, at his own cost and expense, " a good, sufficient and firm wharf, pier or street of seventy feet, English measure, in breadth, on the south side of the first described lot of ground, number six hundred and fifty-three, hereby granted, contiguous to the East river or harbor of the said city, and distinguished in the map or plan hereto annexed, by Front street," and that he would forever thereafter keep and maintain said wharves, piers and streets in good repair and condition, and for the free and common passage of the inhabitants of said city. The city covenanted that it had full power and lawful authority to convey said premises and warranted the peaceable and quiet possession in the said Rutgers, his heirs and assigns forever thereafter.

It further appeared that at some time thereafter, but at what precise time is not clearly shown, the said street, wharf and bulk-head were constructed, and the said Rutgers was in possession thereof, collecting the wharfage accruing thereat. It further appeared that the wharf and bulk-head connected with said street as built, extended some sixteen feet into the harbor beyond the southerly line of a seventy foot street. The actual location of the line seems to have been acquiesced in by all parties, and has for a period of over fifty years constituted the southerly exterior line of the city at the place indicated, under the name of Front street, it having been changed from South street at an early period.

Henry Rutgers having died, his executors, in° 1834, under power contained in his will, executed and delivered to Jonathan D. Stevenson and Nathaniel Pearce a lease of the said premises, " together with all and singular the easements, profits, commodities, emoluments, rights and appurtenances whatso-

ever to the premises above described, and every part thereof belonging or in anywise appertaining, and particularly the wharf and water privileges to the extent of the rights of said parties of the first part" for the term of twenty-one years, with a covenant for the renewal thereof for the further term of twenty-one years, upon terms which were to be fixed by a certain rate of interest to be computed upon a valuation by appraisers of the demised premises, exclusive of the erections thereon, and which renewal was duly executed by the assignees of said lessors in 1857. The said lessees immediately thereafter entered into possession of said demised premises, and either themselves or by their assignees have ever since continued to occupy and enjoy them under said lease and renewal until the termination thereof.

On November 30, 1838, *at the request of the said lessees,* the mayor and common council authorized by resolution a pier to be built, under the direction of the street commissioner, in the slip between Clinton and Montgomery streets at the expense of the owners, on the said slip, to be thirty feet wide and to extend from South street into the East river two hundred and forty-three feet, distant one hundred and forty feet from the pier at Clinton street, and required the said street commissioner to give due publication of said resolution in the daily newspapers. This resolution located the proposed pier wholly upon and near the center of the bulk-head constituting the southerly boundary of lot No. 653 as extended by the grant hereinbefore referred to. Notice of the resolution was published in the city daily newspapers for a period of six weeks successively.

Within two weeks after the commencement of said publication said lessees addressed and delivered a communication to the street commissioner to the following effect, viz.:

" The undersigned lessees, having the same rights and privileges as the owners of the soil to the bulk-head between Clinton and Montgomery streets adjoining the contemplated pier ordered to be built between the said streets, do hereby signify

their willingness to build said pier at their own expense according to the ordinance of the common counci'

"NEW YORK, *December* 12, 1838.

"J. D. STEVENSON.
"N. PEARCE."

No other application was presented for the building of said pier, and, on the 23d day of January, 1839, the street commissioner gave to said Stevenson and Pearce an instrument, reading as follows : " Permission is hereby given to Jonathan D. Stevenson and Nathaniel Pearce to build a pier in the slip between Clinton and Montgomery streets; said pier to be thirty feet wide and to extend from South street two hundred and forty-three feet into East river, distant one hundred and forty feet from the pier at Clinton street; the pier to be built at their expense and for their benefit."

The said Pearce soon thereafter having acquired by assignment the rights of his co-lessee, Stevenson, constructed said pier of the width of thirty-five feet at an expense of about $12,000. In November, 1840, Pearce, to satisfy the doubts of certain persons as to the power of the street commissioner under the statute to give the permission referred to, requested the mayor and common council to confirm the same, and thereupon a resolution was adopted, which was approved by the mayor April 10, 1841, to the following effect :

" *Resolved.* That the permission given by the street commissioner to J. D. Stevenson and N. Pearce to build a pier into the East river between Clinton and Montgomery streets * * * be confirmed, subject to such authority and directions in relation to the said pier as the mayor, aldermen and commonalty of the city of New York may exercise according to the laws of this state and the ordinances of the said corporation, and subject also to any and all such rights (if any) which the owners of the fee may, at any time, have in or to the same."

In May, 1844, further permission was given by said city authorities to Pearce to extend said pier seventy feet further

into the river, at his own expense, and an extension of eighty-seven feet was soon afterwards made thereto by Pearce. Prior to 1848, and during his occupation of said pier, Pearce twice mortgaged it as security for loans made by him, and in 1846 conveyed to Algernon S. Jarvis, by assignment, an undivided half of all of the property held by him under the lease from Rutger's executors. In 1848 Pearce and Jarvis executed and delivered to the defendant herein a conveyance of the interest in the bulk-head and water privileges in front of the premises acquired under the lease from Rutger's executors; and also by a separate conveyance, at the same time granted, bargained and sold to the said defendant by warranty deed the said pier with its appurtenances.

Upon the trial before the court, without a jury, the complaint was dismissed, and the judgment entered thereon for the defendant was, upon appeal, affirmed by the General Term.

The rights of the city in the lands under water around the island of Manhattan from high-water mark to four hundred feet beyond low-water mark were acquired, at an early period through the Dongan and Montgomerie charters, from the crown of England, and the grants therein contained have been ratified and confirmed by numerous conveyances from the state, and acts of the legislature since the separation of the colonies from the English crown. These grants were obviously made to extend municipal control over said lands, and enable the city to regulate the erection of necessary structures upon the land under water around the island, with a view of promoting facilities for the growing commerce and trade of the port of New York and to regulate and preserve the rights of riparian owners in such lands, and the navigable waters covering them.

The extent of the interest and authority of the city over such lands has been the subject of much controversy, and divers views have been expressed thereon by various judges

from the earliest times. It has been sometimes said that the ownership of the fee in such lands gave the city, as matter of legal right, authority to erect and build such structures thereon as they saw fit to make. We are inclined to think that this proposition to its full extent cannnot be maintained, The right of control over the navigable waters of the state is a legislative power, and cannot be destroyed by any authority whatever. The right of the People to use the natural public highways of the state is *jus publica*, and cannot be taken away or seriously impaired by any legislation whatever (*Smith* v. *City of Rochester* 92 N. Y. 477; *Ledyard* v. *Ten Eyck*, 36 Barb. 102.) The power of regulating, controlling and improving such waters in the interest of commerce undoubtedly exists. The right, therefore, of the city to erect structures in the navigable waters of the state must necessarily remain subject to the sovereign authority over such highways. These propositions are quite apparent from the course of legislation on the subject. One of the earliest, if not the first act on the subject, is chapter 88, Laws of 1787, which provided, among other things, that the mayor, aldermen and commonalty of New York should have authority to make by-laws, rules and ordinances for the better regulating and altering the streets, wharfs and slips in such manner as shall be most commodious for shipping and transportation.

A clear view, however, of the general condition of the law, with reference to these rights and the difficulties and controversies which have arisen over them, may be obtained by a brief synopsis of the provisions of the act of 1798, one of the earliest statutes on the subject, and the petition of the city, upon which it was founded. That petition states, in substance, that, " as well for the ornament and improvement of the city, as for the encouragement of the trade and commerce of the state, and the safety of the shipping at the wharfs of the city, your petitioners have lately directed a permanent street, of seventy feet wide, to be laid out and completed at and on the extremity of the grants already made, and hereafter to be made to individuals, on the East river, called

South street, and on the North, or Hudson river, called West
street, south and west of which streets no buildings of any
description are to be permitted to be erected, so that vessels
lying at the wharves may be secured from fires." "That, by
reason of the curving and otherwise irregular state of the
shore at low-water mark in the East and North rivers,
at the time of the making of the grants by the prede-
cessors of your petitioners, a general map of which, if
ever made, cannot now be found, the grants heretofore made,
are deemed to extend to unequal distances into both
rivers, which occasions difficulties in making the permanent
streets aforesaid regular, and that in many instances, although
your petitioners are willing gratuitously to give the soil under
water on which those streets of seventy feet wide are to be
made, yet doubts are entertained whether your petitioners can
compel any of the proprietors of lots fronting thereon, and who
may be unwilling to make those streets for public use in any
given reasonable time to be appointed by the common council.
And your petitioners further show that part of their plan
aforesaid was to extend piers at right angles from the said
permanent streets into the rivers at proper distances from each
other to be determined by the corporation, with suitable
bridges, for the accommodation of sea vessels, and so con-
structed as to admit the currents at both ebb and flood in both
rivers, to wash away all dirt and filth from the wharves and
thereby render the health of the inhabitants of the city more
safe and secure; but doubts have also arisen whether your
petitioners can compel the individual proprietors of the
wharves to sink and lay out those piers, or if they shall refuse
whether your petitioners will be authorized to sink and build
those piers at the expense of the city and receive the wharf-
age without incurring a breach of the conditions and covenants
contained in their grants to individuals." The petition there-
upon invoked the aid of the legislature to provide by appro-
priate legislation for the difficulties suggested.

The preamble in the act substantially recited the contents
of the petition, and, for the purpose of obviating the difficulty

referred to, enacted by section 1, in substance, that the city should have authority to lay out the streets and wharfs mentioned in the preamble, and to extend the same along the sides of said rivers as the growth of the city should require. Section 2 provided that said streets and wharfs should be made and completed according to the said plan by and at the expense of the proprietors of land adjoining in proportion to the breadth of their several lots on the river, by certain days to be appointed, and that the respective proprietors of such said lots, as may not adjoin said streets or wharfs, shall also fill up and level, at their own expense, the spaces lying between their said several lots and the said streets and wharfs, and shall upon so filling up and leveling the same be respectively entitled to and become the owners of the intermediate spaces of ground in fee simple. Section 3 provided that the mayor, aldermen and commonalty should be authorized, in case of the neglect or refusal of the proprietors to level and fill up such places, to do the same for them and charge to and collect from such owners the cost of such filling. Section 4 provided that the sums expended by the city should be assessed upon said owners and occupants, and be a lien and incumbrance, superior to any other incumbrance, upon the houses and lots in respect to which said assessment shall have been made. Section 5 provided that it should be lawful for the city authorities to direct piers to be sunk and completed in front of such streets and wharfs and at such distances from each other as they should think proper, at the expense of the proprietors of lots lying opposite to such piers; and if such proprietors should neglect or refuse to sink or make said piers by the time appointed, then it should be lawful for the mayor, aldermen and commonalty to sink and make said piers and bridges at their own expense, and to receive for their own use the wharfage accruing thereat. Section 6 preserved the validity of the claims, covenants and conditions of previous grants made by the city to individuals; and section 7 enacted, "That no building of any kind or description whatsoever (other than the said piers and bridges), shall at any time hereafter

be erected upon the said streets or wharfs, or between them, respectively, and the rivers to which they respectively shall front and adjoin." These are all of the provisions of that act which it is material to notice. Subsequently, and prior to 1807, other acts were passed to the same general effect as that of 1798, viz. : Sections 1, 3, 4, 5, 6, 7, chapter 129 of the Laws of 1801, and sections 1, 2, 3, 4, 5 of chapter 126 of the Laws of 1806. The act of 1806 for the first time, so far as we have discovered, provided that in the case of piers ordered to be sunk by the corporation, if the adjoining owners should neglect or refuse to sink or build the same, the privilege of so doing might be granted by the city to other individuals.

Other acts bearing upon this subject were subsequently passed by the legislature, the most complete and comprehensive of which is undoubtedly that of chapter 86, called the revised act of 1813 and consisting principally of a re-enactment of the provisions of previous statutes. (§§ 220–227 refer to the subject.) It is unnecessary, for the purposes of this discussion, to refer particularly to the provisions of this act, or the other acts referred to, as they all aim to preserve the pre-emptive rights of the littoral owners, to grants of rights and privileges in land under water, which should thereafter be made by the city, and make the authority of the city to confer such rights upon others, depend upon the neglect and refusal of the riparian owners, after due notice to comply with the terms lawfully prescribed by the city as the conditions of the grants. The provision forbidding the erection of any structure or building between the wharves and the rivers, except piers and bridges, is carefully repeated in each successive statute. It seems very clear, from the provisions referred to, that the authority given to the city to grant rights under water in the harbor to others than the littoral owners, on certain conditions, by necessary implication inhibits the granting of such rights to others, except upon compliance with the conditions annexed to the exercise of such authority.

Neither do we entertain any doubt as to the power of the authorities of New York to grant the privilege of constructing

piers in front of the wharves and bulk-heads thereafter made to others than the owners of such structures, provided they comply with the conditions prescribed by the act. All conveyances made after that act by the city must be deemed to have been taken subject to its provisions, among which was the right in the city to construct such piers on conditions. It is, therefore, quite unnecessary to inquire what the common-law rights of littoral owners in waters adjoining their lands may be, as, in this case, those rights are carefully defined and protected by the statutes. These statutes, and many subsequently passed (1 R. S. [7th ed.] 572–574), show a uniform policy on the part of the state to secure to the owners of lands on the harbor a pre-emptive right to the advantages and emoluments to be derived from the ownership and possession of lands having a water front, however much the shore line of such harbor may be varied or changed by the needs of the city, or from other causes. In obedience to the requirements of these provisions, when the city, previous to 1806, determined to establish an exterior line on the East river between Clinton and Montgomery streets, and fill up the intervening space to high-water mark, it proposed to the littoral owners not only to grant the land under water for a street and wharf, but also the intervening land necessary to connect their existing possessions with the water fronts to be constructed by them.

Some question has been made over the quantity of land covered by the description in the deed from the city to Rutgers; but we are of the opinion that, reasonably interpreted, it gave to the grantee all of the land between low and high-water mark necessary to establish a street and wharf in the harbor, and was not necessarily restricted by the distances mentioned therein. The rule that courses and distances in the description of a deed must yield to natural or artificial monuments if necessary to cover the lands plainly intended to be conveyed, is elementary and needs no citation to support it. The terms of the grant expressly conveyed land lying between high and low-water mark extending from the grantee's land on the north to the harbor on the

south.   The plain purpose of the grant was, among other
things, to enable the grantee to construct a wharf on the land
granted, accessible by water at all times from such harbor, and
which should form the extreme southerly line of the city at
that place.   The deed provided that the wharf, pier or
street to be built should be seventy feet wide on the south
side of the granted lands, and should be contiguous to the
harbor, and precluded, by necessary implication, the idea that any
land was to be reserved by the city whose use could be made to
interfere with the enjoyment of such wharf.   Not only this, but
it was the uniform expression of the statutes referred to that
after the construction of the streets and wharves therein pro-
vided for " That no building of any kind (other than the said
piers and bridges) should at any time thereafter be erected
between said streets or wharfs and the rivers to which they
respectively shall adjoin."

The wharf and street in question were built by Henry
Rutgers in pursuance of such grant, and under the direction
and supervision of the city authorities and presumably accord-
ing to their instruction, and there is nothing in the
description of the deed which restricted the location of the
wharf except that it should be on the southerly side of
the grant, contiguous to the harbor, and connected with the
street in such manner that the free and common passage of
all persons thereon should be assured, as upon other public
streets of such city.   Henry Rutgers and his heirs and devisees
have now been in possession of the wharf, as originally built,
either personally or through their tenants, for upwards of
half a century, and its ownership has never been questioned
by the city or by anyone having the right to challenge the title
acquired by them.   It is too late, therefore, for any one to
dispute their title to the bulk-head and wharf, and least of
all those who have occupied it as tenants under them.

It becomes material, therefore, to consider what rights the
executors of Henry Rutgers had in the premises in question
at the time of the demise, and what property the lessees
received and enjoyed under such lease.   The title of the

lessors and their grantees to the upland, and the fee of the street is not questioned. They also had, as we have seen, the title to all lands lying between their original possession and the wharf with such water-rights as pertained to its ownership, together with a pre-emptive right to any further grant of privileges by the city in the lands under water lying in front of such premises. As the grantees of a wharf from the city, they acquired not only the right to collect wharfage thereat, but also the right of unobstructed access thereto over the waters of the harbor, as well as the pre-emptive right to acquire the ownership of all the piers or bridges thereafter required by the city to be built in front of such premises. (*Verplanck* v. *City of New York,* 2 Edw. Ch. 220.) These questions we conceive to have been decided in the case of *Langdon* v. *Mayor, etc., of New York* (93 N. Y. 129.) That case determined, among other things, that, "a grant of the right of wharfage, at a wharf adjoining land under water belonging to the grantor, carries with it, as a necessary incident and appurtenance, and as a part of the grant, a right of way, or access to the wharf for vessels over such adjacent lands." And it was further said, in the same case, "that a grant of the right to build and forever maintain a wharf upon the land of the city would, upon the same principle, carry with it the right to take the wharfage and have access to the wharf." It was also held that the plaintiff was entitled to maintain an action to recover damages from the city for filling up and making land upon its own property in front of the plaintiff's wharf.

The principle involved was confirmed in the subsequent cases of *Williams* v. *Mayor, etc.,* (105 N. Y. 420), and *Kingsland* v. *Mayor, etc.* (110 N. Y. 569), and would seem to be too well settled in this court to, admit of further controversy. The beneficial use and enjoyment of all the rights and privileges possessed by the heirs and devisees of Henry Rutgers in the demised premises for the term provided for, passed to the lessees under the lease from his executors. They thereby acquired the right, not only to the use

and enjoyment of the premises demised and of all easements connected therewith, but also the right to make all such erections and improvements thereon and additions thereto, as should contribute to their profitable employment, which were not prohibited by the terms of the lease, and did not constitute waste.    (Taylor on Land. & Ten. § 178.)

They could lawfully make new erections upon the lands demised, or additions to those already there ; they could extend and improve the wharf so as to increase its facilities, or build a pier attached thereto (provided they obtained consent of the city therefor) and occupy and enjoy its use during the term of their tenancy, and if it was a fixture for trade purposes, and did not constitute waste, could tear it down and remove it at any time before the expiration of their term, provided they surrendered the premises in as good condition as they were when originally leased.    (*Jackson* v. *Brownson*, 7 Johns. 227 ; *Bradstreet* v. *Pratt*, 17 Wend. 44 ; *Livingston* v. *Reynolds*, 2 Hill, 157.)

The covenants of quiet enjoyment in the lease precluded the lessors from entering upon the demised premises during the term for the purpose of making erections or alterations thereon which should impair or interfere with the full enjoyment thereof by the lessees, and they equally precluded them from disturbing or preventing the tenants from erecting any structures thereon which should conduce to their more profitable employment during the existence of the tenancy, provided such tenants should deem it desirable to build, and acquired authority from the city to do so.    (*Heermance* v. *Vernoy*, 6 Johns. 5 ; *Blake* v. *Jerome*, 14 id. 406 ; *Dixon* v. *Clow*, 24 Wend. 188 ; *Agate* v. *Lowenbein*, 57 N. Y. 604.)

It would seem, therefore, that no act was done by the tenants during the term of the lease which gave the landlord a right of re-entry as for a forfeiture, or that constituted a breach of the lease, giving a cause of action to the lessors.    The tenant could lawfully adapt the premises to the purpose of securing the most profitable use of them not inconsistent with the terms

of the lease, and the landlord had no right or power of inter-
ference therewith. (*Austin* v. *H. R. R. R. Co.*, 25 N. Y. 334.)

It cannot be questioned but that the erection of a pier thirty-
five feet wide, occupying over a third of the wharf, extending
from it over the water for upwards of three hundred feet,
would constitute a very serious interference with the estate
demised, if not occupied by the tenants, or, but that, on the
other hand, it would create an important extension of the wharf
rights and a valuable addition thereto, if possessed by those
who had the right of using the wharf. The landlord had no
right to build it, and was under no legal obligations to do so
during the term of the tenancy, and the tenants did have that
right and could occupy it during their term as the owners,
*pro hac vice*, of the wharf adjacent thereto.

The general rule of law is, that whatever is fixed by the
tenant to the freehold, becomes a part of it, and is subjected
to the same rights of property as the land (Taylor's Landlord
and Tenant, § 525); but it is unnecessary, perhaps, to determ-
ine whether this pier, when erected and attached to the
demised premises, become a fixture and was irremovable, or
was simply a structure built for trade purposes, and, there-
fore, movable during the term, inasmuch as it was upon the
demised premises, and was not so removed upon surrender,
and, therefore, reverted to the landlord as part of the prem-
ises. The surrender of the leased premises by the assignors,
by operation of law, vested the landlord with the title of any
structures remaining thereon. (*Agate* v. *Lowenbein*, 57 N. Y.
607.) The application of the rule expressed in the maxim,
" *Quicquid plantatur solo, solo cedit* " (Wharton's Maxims,
73), to this pier, if located upon the land demised, would
seem to be unquestionable, and we can see no distinction
between that case and one where it is immovably annexed to
such land and occupies the place of an easement appurtenant
thereto. It is said in Wood's Landlord and Tenant (§ 179),
that, if the tenant " incloses land, whether adjacent to, or in
the vicinity of the demised premises, and whether the land
be part of the waste or of the highway, or belongs to the

landlord or some third person, the presumption at the end of
the term is, that the inclosure is part of the holding, and was
made for the benefit of the landlord." This rule was applied
in the case of *Dempsey* v. *Kipp* (61 N. Y. 470), to a private
way procured by one Leddick, a tenant, for the benefit of a
farm occupied by him as such tenant. It was said by
DWIGHT, Commissioner: "As soon as Leddick acquired the
right, it enured to the landlord's benefit. It is settled law,
that all that the tenant thus acquires from third persons,
appertains to the landlord. The rule is applied even to
encroachments made by him upon the lands of others;
*a fortiori*, would it be applicable where the acquisition is made
by consent, or through contract with the owner of adjoining
lands." After referring to some English cases on the sub-
ject, he continues : " These cases establish the doctrine that a
tenant, even from year to year, has a capacity to acquire
a permanent interest in adjacent lands belonging to third
persons, for the use of the leased property, which shall enure
to his own benefit while the tenancy continues, and on its
expiration shall appertain to his landlord. There appears
to be no difference in principle, whether the acquisition is
made by prescription or by contract. The tenant's intent
is the main subject of inquiry. In the case at bar, the
intent of both parties, as has been already shown, is plain."
Speaking of the rule that a tenant shall not dispute the title
of his landlord to demised premises, Washburn on Real
Property (p. 483) says : " Cases have arisen where the doctrine
above stated has been applied to lands in possession of a tenant,
in favor of a landlord, although the same were not embraced
in the terms of his lease." We have no doubt but that the
rule referred to, so far as it applies to this case is founded
upon correct principles, and when applied to property acquired
by a tenant for the more profitable employment of the demised
premises, physically connected therewith and essential to their
enjoyment, is fully justified by the reason of the rule and the
justice of the case. We could not conceive of a case calling
more strongly for the enforcement of the rule than the one

under consideration. Here the inclosure was simply an extension of the water front, originally demised, and cannot be used except in connection with the wharf and bulk-head to which it was attached. It cannot even be maintained separately except by the substantial destruction for commercial purposes of the demised property. The statute requires such piers to be attached to bulk-heads and they could not have been lawfully constructed but for this connection, and cannot be maintained as a pier without it. It is impossible that any intent in regard to its use could be entertained by anyone except as an appurtenance to the property in the mainland, and the finding to a contrary effect was unwarranted by the evidence and the plain implication of the law authorizing the construction of the pier. The opinion expressed in some of the cases that the intent of the tenant in making an inclosure or acquisition must govern, was used in cases where the acquisition was made of lands lying outside the demised premises. It can have no application to an erection or inclosure made upon the demised premises or on an appurtenance thereof. In such a case the intent is a question of law. Moreover, such intent, we think, is conclusively shown by the proceedings through which permission to build the pier was acquired. In the consideration of this question we must look at the proposal of the lessees as well as the resolution of the mayor and common council accepting the same, as they together constitute the contract made between the parties. Under the act the mayor and common council alone had authority to grant privileges to build piers in the harbor and the previous permission of the street commission had no validity except as it was confirmed by the city authorities.

The right of Stevenson and Pearce to acquire permission to build the pier was based wholly upon the claim that they were "lessees, having the same rights and privileges as the owners of the soil, to the bulk-head between Clinton and Montgomery adjoining the contemplated pier," and not upon any claim that the owners had lost their pre-emptive right by neglect or refusal to build, and the confirmation by the mayor and com-

mon council of the permission previously given by the street
commissioner was made expressly subject to the rights of the
owners of the fee.   The tenants clearly attempted to clothe
themselves with the statutory rights of their landlords and
recognized them by irresistible implication; and the city limited
the right granted to them to that pertaining to their character
as representatives of the littoral owners.   Having obtained
the right in such character, they would clearly be estopped
from asserting any other right, as against the party, they
assumed to represent.

It cannot, we think, be maintained that Stevenson and
Pearce at this time had any idea of obtaining any rights in
the pier, except such as should belong to them as tenants.
Their lease then had nearly forty years to run, and they were
assured of the use of the pier for a long period without any
increase in rent, and they might well suppose that its occupa-
tion for so long a period would be sufficient compensation for
the cost of the structure.   The meaning of the language used
in the street commissioner's permission, that it was to be built
"at their expense and for their benefit," is abundantly satis-
fied by the right which they actually acquired to use it during
the term of their tenancy, and the reservation of the rights of
the landlord shows that it was not intended to have a more
extended signification.

We, therefore, think the right to build the pier was acquired
by the tenants after they had clothed themselves with the
equities of their landlord, and was built as appurtenant to and
for the more profitable employment of the demised premises
and could not be retained by them after the expiration of their
term.   We are further of the opinion that the defendant
came clearly within the operation of the rule that tenants, who
have been put into possession of premises and permitted to
occupy them by a lessor, are precluded from questioning his
title in an action to recover possession of such premises or any
part thereof.   (Wash. on Real Prop. 482.)   We are also
of the opinion that the landlords acquired the right to this
pier under the rule laid down in *Steers* v. *City of Brooklyn*

(101 N. Y. 57). If the effect of this pier, separately main-
tained, was, as it unquestionably is, to destroy the substantial
and profitable use of plaintiff's wharf and bulk-head, its erec-
tion and retention by the tenants, after the expiration of the
tenancy, was a breach of the contract to surrender them in
good condition. It was, therefore, wrongful and became an
accretion to such wharf belonging to its owners.

It cannot, in justice, be maintained that a tenant can right-
fully build a structure during his tenancy over an easement
appurtenant to demised premises, which should substantially
destroy the easement and the use and value of the demised
premises without being answerable therefor to his landlord.
When such structures are wrongfully built as an appurtenance
of a wharf or bulk-head over the water, the law treats them
as an accretion to the land of the littoral owner and awards
their ownership to such owners. (*Steers* v. *City of Brooklyn,*
*supra ; Ledyard* v. *Ten Eyck,* 36 Barb. *supra ; Mulrey* v.
*Norton,* 100 N. Y. 424.)

It is further claimed by the defendant that it has acquired
title to the pier by adverse possession under deed from
Pearce and Jarvis. This deed was given to it simultaneously
with the delivery of a conveyance, by the same parties, of the
rights they possessed in the bulk-head and wharf under the
lease from Rutger's executors.

It is not explained why Jarvis, who held only under the
lease, should have joined in this deed ; but it appears there-
from that the defendant endeavored to protect its rights in the
pier both under the lease and the deed.

We are of the opinion that an adverse possession could not
be initiated under either of these conveyances; it evidently
could not under the lease, and it is equally clear that the deed
was impotent for such a purpose. The grantors in that deed
had an interest in the pier which was to continue to the end of
their term, then nearly thirty years distant, and this interest
they had a right to convey even against the dissent of their
lessors. The lessors could bring no action to recover pos-
session of the pier or the water under it, until the expiration

of the term, for their lease had conferred this possession upon their lessees. There is no evidence in the case that the landlord ever had notice that the lessees or their grantees or assigns claimed any greater rights in the waters of the harbor than those acquired under their lease. The only pretense in the evidence of any such· knowledge is that Crosby, one of Rutger's executors, was about the pier frequently after it was built, and the inference therefrom that he must have known of its existence and use. Crosby, however, in execution of his powers under the will, conveyed this property to Beecher in trust in 1837, and wholly ceased to have any interest in it before the pier was built. Beecher, the trustee, lived at Batavia when the pier was built, and Denio, who succeeded Beecher as trustee, resided at Utica; both at a distance of several hundred miles from the location of the pier. There is not the least evidence that either of the trustees or any of the beneficiaries had any knowledge of a claim to an adverse possession by any one. Even if they had such notice, it is not perceived what effect it could have upon their rights.

It is quite certain that the present defendant occupied and had the right to occupy the pier under its lease from 1848 to its termination in 1877, and it is not pretended that it ever attempted to surrender such rights during the existence of the term, or committed any act which authorized a re-entry thereunder.

We are unable to find any steps taken by the original tenants, or their assignees, which can be made the foundation of a claim of adverse possession. What was said by Judge FINCH in the case of *Whiting* v. *Edmunds* (94 N. Y. 314), contains a sufficient answer to the claim. He says: "The tenant cannot by a disclaimer, or by mere words denying the landlord's title and asserting one of his own, work a forfeiture of his tenancy, or set running an adverse possession. (*De Lancey* v. *Ganong*, 9 N. Y. 1.) Where the relation of landlord and tenant has been once established, the possession of the latter and that of his grantees and assignees is the possession of the landlord,

and not hostile or adverse (*Jackson* v. *Davis*, 5 Cow. 129 ; *Sands* v. *Hughes*, 53 N. Y. 293) ; and this is true even where the grantee has taken a deed of the fee in ignorance of the fact that his grantor stood in the relation of a tenant, the latter denying any such relation. (*Jackson* v. *Scissam*, 3 Johns. 499.) The possession of the tenant in subordination to the title of the landlords continues not only during the running of the term, but is presumed to be such and to remain unchanged until twenty years after the end of the term, and notwithstanding any claim by the tenant or his successors of a hostile title. (Code, § 86 ; Code of Civil Procedure, § 373.) This presumption may be rebutted, but to do so effectually and initiate an adverse holding, the tenant must surrender the possession to the landlord, or do something equivalent to that, and bring home to him knowledge of the adverse claim." And so it was said in the late case of *Bradt* v. *Church* (110 N. Y. 543), " That lease oeing perpetual, under well-settled rules of law, every one entering into possession of the demised premises is presumed to have entered under the lease, and that presumption can only be rebutted successfully by sufficient proof of an adverse possession at some time in hostility to the landlord's title. Where the relation of landlord and tenant is once established * * * it attaches to all who may succeed to the possession under the tenant, however remotely."

Some question has also been made as to the legal succession by the plaintiffs to the rights of the original lessors ; but we are of the opinion that no material defect exists in the proof relating thereto.

The judgments of the General and Special Terms should, therefore, be reversed, and a new trial ordered with costs to abide the event.

All concur.

Judgments reversed.