**962**

PHŒNIX INS. CO. OF HARTFORD et al. v.
NEW YORK & HARLEM R. CO. et al.

No. 384.

Circuit Court of Appeals, Second Circuit.

June 13, 1932.

Glenn, Alley & Geer, of New York City (William N. Cohen, Garrard Glenn, John S. Sheppard, and Enos Throop Geer, all of New York City, of counsel), for appellants.

Jacob Aronson, of New York City (Crosby J. Beakes and James L. Homire, both of New York City, of counsel), for New York Central R. Co.

Anderson, Gasser, Ferris & Anderson, of New York City (Henry B. Anderson and Roy C. Gasser, both of New York City, of counsel), for New York & Harlem R. Co.

Before MANTON, L. HAND, and AUGUSTUS N. HAND, Circuit Judges.

MANTON, Circuit Judge.

The appellants, minority stockholders, sue for an accounting of rents and profits obtained by the New York Central Railroad Company from property leased to it by the New York & Harlem Railroad Company under the terms of a 401-year lease. It is conceded that, if the relief asked should be granted, the appellants are properly in court as such stockholders, without first requesting the New York & Harlem Railroad Company to commence a suit, for the reason that the New York & Harlem Railroad Company is now controlled by the New York Central Railroad Company.

On April 1, 1873, the predecessor of the New York Central Railroad Company leased from the New York & Harlem Railroad Company its railroad "and all other its real estate and chattels real * * * lying and being north of 42nd Street, in the City of New York, * * * whether used for railroad purposes or not." Certain of the premises in and about the Grand Central Terminal in New York City, included in the lease, although occupied by railroad facilities and used intensively for railroad purposes below the surface, have been improved above the surface by commercial structures. The rents and profits obtained from such use of the premises thus leased are the bases for the present suit. The claim is that the New York & Harlem Railroad Company did not and lawfully could not lease its property for any purposes, except railroad purposes, solely and exclusively, and that the Central, by subleasing portions of the demised premises for commercial purposes, has violated the lease and wrongfully appropriated property of the Harlem Company for which the latter is entitled to an accounting. There is also a claim that an exchange of property, which now forms the elevated highway around the Grand Central Terminal, with the city of New York, was improperly made, and that the Central is responsible in damages for this as a breach of the lease.

The Harlem in 1873 was the owner of a steam railroad operating from Forty-Second street, New York City, through Westchester, Putnam, and Dutchess counties to Chatham Four Corners, Columbia county, and some branch lines. Part of the leased property, between Forty-Second street and the Harlem river, was on Park avenue.

The New York, New Haven & Hartford Railroad Company, or its predecessor, since 1848 has used the tracks of the Harlem south of Woodlawn. Under a tripartite lease made November 1, 1872, between the Harlem, Central, and New Haven Companies, provision was made for the Grand Central Station, upon lands of the Harlem, extending from Vanderbilt avenue to Fourth (Park) avenue and from Forty-Second street to Forty-Fifth street. The work of separating the grade of the railroad from the grade of the street, as to a portion of the railroad land, was in progress at the time of this lease. Chapter 702, Laws of 1872. The growth of railroad travel, the need for proper entry into New York City, the increased use of city streets, bringing regulatory street statutes looking to the elimination of grade occupation, and the expanding of business generally, made new and enlarged railroad facilities necessary. The lease recites that the interest and convenience of the public and the parties would be promoted if the railroad property of the Harlem was leased to the Central. This necessarily had to be for a long term. Whether or not by the terms of this lease the Harlem reserved to itself the right to share with the lessee in the profits earned by the latter from the property demised, but not strictly devoted to railroad purposes, is the question presented.

A reasonable interpretation of the express provisions of the instrument leads us to the conclusion that such was not the intent of the parties. The principal contention of the appellants is that the Harlem did not and could not lease the property which was not actually or potentially in use for railroad purposes, having no power to do so. Chapter 218 of the Laws of 1839 (now section 148 of the Railroad Law [Consol. Laws, c. 49]) authorizes railroads to contract inter sese "for the use of their respective roads, and thereafter to use the same in such manner as may be prescribed in such contract. But nothing in this act contained shall authorize the road * * * to be used by any other railroad corporation, in a manner inconsistent with the provisions of the charter of the corporation whose railroad is to be used under such contract." The purpose of this act was to prevent abandonment of the franchise and the cessation of use of land for railroad purposes, by means of a conveyance or lease. Any such attempt to avoid the quasi public duties and obligations of a railroad or other utility has been held to be void. Bath Gas Light Co. v. Claffy, 151 N. Y. 24, 45 N. E. 390, 36 L. R. A. 664; Troy R. R. Co. v. Boston R. R. Co., 86 N. Y. 107; Abbott v. Johnstown R. R. Co., 80 N. Y. 27, 36 Am. Rep. 572. But the act was not intended to deprive a railroad company of powers it otherwise

had to use property as it pleased so long as it did not violate the duty to operate the road with all possible convenience and comfort. The Central took under the lease all the powers and privileges enjoyed by the Harlem with respect to the property leased. It is quite clear that the Harlem could have used its surplus property for the same purposes which the Central did, if it had not made the lease in 1873. When the Harlem transferred this estate by the lease, it gave its then present interest in the property to the Central.

The lease provided, in article 1, for the demise of the premises, "with all the lands on which the said railroad and branch * * * is constructed and which are connected with or necessary for its use and all the rights, easements, franchises and privileges in connection therewith, * * * depot grounds, depot buildings, and the land and premises on which the same are situated and standing, now used or belonging, or in anywise appertaining to the said railroad and branch * * * and all other the real estate and chattels real of the said party of the first part situate, lying and being north of 42nd Street, in the City of New York * * * whether used for railroad purposes or not * * * and the right to ask, demand and receive for the use and benefit of the said party of the second part [the Central] all the tolls, profits, income, rent from subletting and charges * * * or resulting in anywise from the use or occupation of said railroad or branch * * * to have and to hold the said demised railroad branch and leased line, premises * * * for and during the said term. * * * " Article 14 assigned "all other leases, contracts or agreements * * * to which it [the Harlem] is a party, with all the uses and benefits therefrom or thereunder." Article 16 authorized the Central to discontinue any part of the present way or track or depots not required for the use of the line; to change the grade of the road; to alter or change the location of any of the tracks or buildings or erections appurtenant thereto, or connected therewith; to purchase any additional real estate for the use of the road; to exchange any of the lands or buildings for other lands more convenient or necessary and of equal value; and also, at any time during the continuance of the lease to sell and dispose of such part of the demised premises and property as may not be necessary for the use of the railroad. Article 17 provided for an accounting to the Harlem for any consideration money at any time received by the Central for any portion of the lands demised by the lease which shall have been previously disposed of by the Central, except where exchanges for other lands of equal value were made. Article 18 gave the Central the right to receive "all the income and revenue of the aforesaid estate and property" of the Harlem. Article 23 refers to certain lands of the Harlem described in a schedule D annexed to the contract "which parcels of land are not necessary to the operation of its said railroad herein demised to the said party of the second part and the rents, reservations, covenants and provisions herein contained having been adjusted as hereinbefore set forth, with express reference to the provisions contained in this article of these presents," and then provides for the conveyance by deed of these lands to the Central.

The depression of the tracks in the Grand Central Terminal area and the electrification of the railroad, pursuant to chapter 425 of the Laws of 1903, made available for improvements supersurface spaces above the depressed tracks, and, to the extent that such supersurface spaces were not at the time required for railroad purposes, leases thereof were made by the Central for commercial purposes. These leases were for 21 years with the right of renewal and with other conditions. Under these leases the superface spaces were safeguarded for future railroad uses should such uses become necessary. It was provided that the leases might be terminated in any event after 42 years, but this is not unreasonable considering that the term of the lease in question was for 401 years. Under the provisions of the lease, which assured to the Central all income from the leased property, it is entitled to rentals from the subleases made by it for such supersurface spaces, at least pending the use of the subsurface spaces for railroad purposes. Since the supersurface spaces were not needed for railroad purposes when the leases were made and up to the present time, it was within the authority of the Central under the terms of the lease to profitably sublease such premises. Of course, the Central must make such leases of the property as will not interfere with or cause injury to the reversion. No injury to the reversion has been claimed by the appellants in the complaint or on the argument. The beneficial use and enjoyment, under the terms of the lease included the right to make all such subleases and to put the premises to profitable employment. Presby v. Benjamin, 169 N. Y. 377, 62 N. E. 430, 57 L. R. A. 317;

Bedlow v. N. Y. Floating Dry-Dock Co., 112 N. Y. 263, 19 N. E. 800, 2 L. R. A. 629; Klie v. Van Broock, 56 N. J. Eq. 18, 37 A. 469. A railroad corporation has the power to lease or otherwise dispose of property not presently required in the performance of its duty to the public. Roby v. N. Y. C. & H. R. R. Co., 142 N. Y. 176, 36 N. E. 1053; Kip v. N. Y. C. R. R. Co., 140 Misc. Rep. 62, 250 N. Y. S. 5.

■ The contention that legislative sanction was necessary to authorize the leases by the railroad of property which had been discontinued in use for railroad purposes is without merit. General Railroad Law, chapter 140 of the Laws of 1850 (in force in 1873). While it is well settled that a railroad corporation cannot make a valid lease of all its railroad and franchises in the absence of express legislative sanction, it is equally settled that a railroad corporation, as any other corporation, may make leases or other disposition of such of its property as is not required in the operation of its railroad business. Black & White Taxicab Co. v. Brown & Yellow Taxicab Co., 276 U. S. 518, 48 S. Ct. 404, 72 L. Ed. 681, 57 A. L. R. 426; Delaware L. & W. R. R. v. Morristown, 276 U. S. 182, 48 S. Ct. 276, 279, 72 L. Ed. 523; Donovan v. Pennsylvania Co., 199 U. S. 279, 26 S. Ct. 91, 50 L. Ed. 192; Branch v. Jesup, 106 U. S. 478, 1 S. Ct. 495, 27 L. Ed. 279; Pikes Peak Power Co. v. City of Colorado Springs, 105 F. 1 (C. C. A. 8).

■ The Supreme Court of New York in Kip v. N. Y. C. R. R., 140 Misc. Rep. 62, 250 N. Y. S. 5, considered the case of a lease in 1858 to the Harlem of the block of land between Forty-Seventh and Forty-Eighth streets, Park and Lexington avenues. It was used by the Harlem for railroad purposes. While the lease was still in existence, the property was condemned. Meanwhile the Central acquired the land under the lease of 1873. After the tracks had been depressed, the Central subleased the surface to the 277 Park avenue corporation and an apartment house was erected. In 1930, the plaintiffs, whose predecessors had leased to the Harlem, sued the Central, alleging that, since a part of the premises were being used for nonrailroad purposes, they were entitled to a proportion of the profits from such use. The state Supreme Court directed judgment for the defendant. The lease was held not to be an abandonment by the railroad of the rights to the surface of the property acquired by condemnation, and "to penalize the railroad for utilizing part of the surface, temporarily,

for other than railroad purposes, and deprive it of revenue obtained therefrom, would not be sound public policy." The plaintiff acquired no rights because the railroad, instead of allowing a portion of extremely valuable property to remain vacant, had made it revenue producing. In Delaware, L. & W. R. R. v. Morristown, supra, a case respecting arrangements with hackmen at stations, the Supreme Court held that "if any part of the land in the driveway [of the station] is capable of other use that does not interfere with the discharge of its obligations as a carrier, petitioner [railroad] as an incident of its ownership and in order to make profit for itself has a right to use or permit others to use such land for any lawful purpose." Of course, if the tenant violates the express terms of the lease, equity has the power to restrain such use. But, where the lessor cannot show a use inconsistent with the terms of the instrument, equity will not interfere to limit the lessee's right of full enjoyment.

In Boyd v. N. Y. & H. R. R. Co. (D. C.) 220 F. 174, cited by the appellants in support of their contention that the Central is in the position of a trustee for the Harlem stockholders by virtue of the ownership of the majority stock in that company, the action was to restrain a merger of the Harlem and the Central companies. Hough, J., held that, because of the existence of the lease of 1873 and an agreement made in 1882 whereby the Central undertook to pay each Harlem stockholder his participation in the annual rent stipulated in the lease, any form of consolidation allowed by the New York statutes would be a breach of that contract on the part of the Central. But the appellants here are suing on the lease, not on the agreement of 1882, and the cause now before us must be decided on the principles which are applicable to landlord and tenant, as that relationship is established by the lease.

■ A conveyance was made in connection with the Grand Central Terminal changes (chapter 425, Laws of 1903). This was an arrangement necessary for handling street traffic in and about the Grand Central Station. It was of interest to both the city and the railroad company. The terminal would be hampered in its use if street congestion made access difficult and retarded traffic. In 1910, by chapter 555 of the laws of that year, which was an amendment to chapter 425 of the Laws of 1903, legislation was enacted with the view to facilitating relief for these conditions. It authorized the making of provision for roadways or driveways connecting

the Forty-Fifth street viaduct with any viaduct which the city might construct carrying the central portion of Park avenue from Fortieth street to the north side of Forty-Second street. Plans and profiles were prepared and approved, and a viaduct or overhead roadway was built on the east side of the Grand Central Terminal. In exchange for the Harlem joining with the Central in making the necessary grant to the city required for such improvements, the Central conveyed to the Harlem, subject to the lease, a parcel of land on Forty-Second street, 80 feet in width and extending to about Forty-Third street, and being part of the land on which the Grand Central Station was constructed, thus vesting in the Harlem the entire plot on which the station stands. Later, by chapter 766 of the Laws of 1923, again amending chapter 425 of the Laws of 1903, another exchange became necessary, due to the increased traffic. This act authorized the submission of amended plans and profiles providing for a roadway along the south, east, and west sides of the Grand Central Station, for the extension of Vanderbilt avenue northerly of Forty-Fifth street, and for the widening of the roadway of Park avenue from Forty-Sixth to Fifty-Seventh streets. The act further authorized the city to acquire from the Central or Harlem, or both, by grant, such easements and rights as might be required for the construction and maintenance of such roadways and extensions; the city was also authorized to grant to the railroad companies or either or both of them such portions of Park avenue between Forty-Fifth and Forty-Sixth streets as should be discontinued and closed in accordance with the modified plans, and it so agreed. Pursuant to this act, the Central made a grant to the city, under which the elevation of the roadway on the westerly side of the Grand Central Station was constructed; the Central made a similar grant to the city for the overhead roadway over the Central's land on the easterly side of the station, and the two roadways, after passing over Forty-Fifth street, were then to turn towards Park avenue within stated planes and reach the grade of Park avenue at Forty-Sixth street after passing through the discontinued portion of Park avenue between Forty-Fifth and Forty-Sixth streets; Vanderbilt avenue was extended from Forty-Fifth to Forty-Seventh street, and the necessary easements for street purposes above certain elevations were granted to the city. The roadways of Park avenue were widened from Forty-Sixth to Fifty-Seventh street, Park avenue was discontinued from Forty-

Fifth to Forty-Sixth street, except the portions within the planes required for the above-mentioned roadways and for sidewalks, and the fee of the discontinued portion of Park avenue was conveyed to the Harlem and Central Companies, in exchange for the easements granted to the city for the elevated roadways and for the extension of Vanderbilt avenue. The exchanges in these cases were made in pursuance of statutory authorization therefor and with a view to caring for the traffic problem affecting the public and the new Grand Central Station. The result was that after construction there was an overhead traffic capable of passing from Park avenue and Fortieth street to Park avenue and Forty-Sixth street without interrupting or crossing the traffic in and around the station.

The appellants complain that the consideration which the Central obtained for this transfer consisted of new streets. But the result of the exchanges made were deemed necessary and constituted an improvement for railroad purposes. It was permissible under the terms of the lease. Since it is not alleged that the exchanges were of unequal value, with the lease then to run 342 years, no injury could possibly have occurred to the lessor's reversion. Nor is there any force in the argument that the conveyances diminished the security behind the lease.

Under the provisions of the lease and the rules of law governing landlord and tenant, we hold the Central was well within its rights under the lease and that the decree below was properly entered.

Decree affirmed.