BROTHERHOOD INV. CO. et al. v. COAL RIVER MIN. CO. et al.

No. 3043.

Circuit Court of Appeals, Fourth Circuit.

Oct. 21, 1930.

H. H. Hoppe, of Cleveland, Ohio (William E. Lamb and Butler, Lamb, Foster & Pope, all of Chicago, Ill., and Taplin & Fillius, of Cleveland, Ohio, on the brief), for appellant Huston.

George D. Moore, of Charleston, W. Va., for appellant Brotherhood Inv. Co.

Ernest K. James, of Charleston, W. Va., for appellee Coal River Min. Co.

Before PARKER and NORTHCOTT, Circuit Judges, and GLENN, District Judge.

NORTHCOTT, Circuit Judge.

The Coal River Collieries, a corporation engaged in the business of mining coal in Boone county, W. Va., was adjudged a bankrupt in the United States District Court for the Southern District of West Virginia, in July, 1928. By order dated November 10, 1928, the property of the bankrupt was ordered sold by the referee. Included in the order of sale and described as "Block No. 2" was the fee title to the surface of a tract of land situated on the waters of Lick creek in Peytona district in Boone county, W. Va., containing 44 acres, more or less, together with the improvements thereon, consisting of a clubhouse, store building, and about 62 dwelling houses. There was also included in the order of sale, property described as "Block No. 3," being that portion of the standard gauge railroad which the bankrupt had constructed from the line of the Chesapeake & Ohio Railroad Company at Ashford Springs, Boone county, W. Va., in a northeasterly direction up Lick creek to the exterior boundary of premises which the bankrupt held under lease from Coal River Mining Company.

One of the appellees, Coal River Mining Company, a corporation under a lease from which the bankrupt was carrying on one of its mining operations, filed exceptions to the order of sale, claiming that the property described as "Block No. 2" should not, under the terms of the lease, be sold separately from the lease and leasehold estate. Coal River Mining Company also excepted to the order of sale as to the railroad (block No. 3), on the ground that upon forfeiture of the lease, the property reverted to it as lessee and could not be sold as a part of the estate of the bankrupt.

The properties in question were offered for sale by the trustee of the bankrupt on November 24, 1928, and the appellant C. H. Huston bid in the railroad property described under block No. 3 for the sum of $5,000, and the Fuel Distributors, Inc., bid in the property described as block No. 2 for the sum of $10,000. Fuel Distributors, Inc., did not deposit any part of the purchase price with the trustees, but exhibited to them notes of the bankrupt aggregating approximately $24,000 secured by a deed of trust upon the property included in block No. 2, which deed of trust was dated April 30, 1927, and was executed by bankrupt. A copy of this deed of trust had been filed in the bankruptcy proceeding, and the claim of the Fuel Distributors, Inc., had also been filed and proven. Subsequent to the lease the bankrupt had acquired title to the surface of the 44-acre tract. Upon this showing the trustees did not require the Fuel Distributors, Inc., to pay the purchase money, but it was agreed that the purchaser would pay its proper proportion of the costs.

On December 7, 1928, at a creditors' meeting, called for the purpose of considering the confirmation of the sales, the trustees reported all the sales made by them of the property of the bankrupt, including the sales above mentioned. The trustees reported with respect to the properties in controversy here that the sales had been made for fair prices and recommended that the sales be confirmed.

Appellee Coal River Mining Company filed exceptions to said report of sale and also filed a petition before the referee praying that the order of sale of November 10, 1928, be reviewed, revised, and altered. Separate answers to the exceptions and petition were filed by C. H. Huston and Fuel Distributors, Inc., and evidence was introduced before the referee by all the parties.

On December 31, 1928, pursuant to notice served on said trustee, the Coal River Mining Company declared a forfeiture of the coal lease heretofore mentioned and immediately took possession of said leased premises and all the property thereon, and on the same date, with the consent of the trustees, the creditors of the bankrupt being represented, an order was entered by the referee directing said trustees to abandon and deliver to said Coal River Mining Company, the lease and leasehold estate and all rights of the Coal River Mining Company arising under said lease and forfeiture.

At some time subsequent to the sale, Fuel Distributors, Inc., assigned all its rights in the matter to the appellant the Brotherhood Investment Company.

On final hearing the referee, in June, 1929, entered an order refusing to confirm the sale of the property described in block No. 2 to the Fuel Distributors, Inc., holding that the title to the surface rights and improvements was vested in appellee Coal River Mining Company. The order of the referee confirmed the sale of the property mentioned in block No. 3 to C. H. Huston.

Exceptions were taken by the Brotherhood Investment Company to the holding of the referee as to the sale of the property described under block No. 2, and exceptions were taken by the Coal River Mining Company as to the holding of the referee as to the property described under block No. 3.

In March, 1930, after hearing, the learned judge entered an order confirming the decision of the referee as to the property sold under block No. 2 and reversing the referee as to the property sold under block No. 3, thereby refusing to confirm the sales in both instances. From this order of the District Judge this appeal was prosecuted by both C. H. Huston and the Brotherhood Investment Company.

The deed by which the Coal River Mining Company acquired title to the coal under the 44-acre tract, the tract mentioned in the description of the property in block No. 2, contained the following provision:

"All of the coal of every kind upon or pertaining to that certain tract (being said 44 acre tract of land) and all the necessary and convenient rights and privileges to enter therein, thereon, and thereunder to prospect for, mine and otherwise operate, manufacture and remove any and all of the coal enumerated above, * * * and the exclusive rights of way for all railroads, tipples, buildings and structures of every kind that may be required by said party of the second part, his successors and assigns in mining said coal, * * * and all the rights and privileges granted herein shall extend and apply to the mining, manufacture and removal of all coal from any and all lands owned and adjacent to the lands hereby conveyed and operated upon by the said party of the second part, his successors and assigns and all tracks, tipples, buildings and structures of every kind constructed upon the lands herein described by the party of the second part, his successors and assigns may be at any time removed by the said party of the second part, his successors and assigns."

The lease from the mining company to the bankrupt refers to the deeds whereby the lessor acquired title to the coal and contained the following provisions:

"Reference is also here had to the record of the several deeds whereby the lessor acquired said real property for a more particular description and the rights and interest in said real property held by said lessor. * * * It is further expressly understood and agreed between the parties hereto that such use of the surface rights shall not be in such way as to prevent the mining and removal of oil and gas underlying said tracts, if any.

"Article 9. * * * Upon the termination of this lease by the expiration of the term thereof, the lessees may, if all the rents and royalties shall have then been fully paid, and all other conditions of this lease shall have been fully complied with, and not otherwise, remove from the leased premises within four months next thereafter, but not later, all property not permanent fixtures, owned by the lessees. * * *

"Article 10. It is further agreed that if at the termination of this lease for any cause, the coal under the terms of this lease on, in or under said premises shall not be mined out, the lessees will leave the leased premises, and improvements and any mines that have been opened thereon, and which may not have been mined out, in good workable condition and maintain and turn over in like condition the entries, air passages, etc., so that the mining of the coal may be continued by the lessor."

"Article 14. The lessees shall not mortgage, nor assign, lease, underlet, sublet, or in any manner transfer or set over, nor promise nor undertake to mortgage, assign, lease, underlet, sublet, nor in any manner transfer nor set over, any of its estate, interest or rights under this lease, or any part thereof, to any person or persons whomsoever, or corporation whatsoever, for any time whatsoever, without the consent of the lessor, its heirs, successors or assigns, in writing for that purpose, being first had and obtained; and in case of every such assignment or transfer under such written consent each and every assignee or transferee hereafter shall assume in writing all the obligations of the lessees hereunder. The lessor hereby assents to the assigning by the lessees of this lease in its entirety and that manner only to the Coal River Collieries, a corporation, to be organized by lessees, upon condition and provided, however, that said corporation assumes every obligation of this lease, * * * and not otherwise."

"Article 16. And it is further agreed that if default be made in the payment of any rents or royalties and shall continue for a period of three months after the same becomes due or the lessees shall fail or refuse to keep and perform each and every of their covenants and agreements herein contained, then in either event, the lessor may at its option terminate this lease and without further notice re-enter upon and take possession of said premises and every part thereof. * * * "

■ It is contended on behalf of the appellant the Brotherhood Investment Company that as none of the coal under the forty-four acre tract had been mined and the 44-acre tract did not immediately adjoin the 2,172-acre tract from which the coal was being mined, but was separated from it by a distance of approximately 1,000 feet, the former tract did not come within the terms of the deed above set out, as being adjacent. The learned judge below held that the 44-acre tract was "adjacent" within the meaning of the deed and with this holding we agree.

"The word 'adjacent,' even in its strictest sense, means no more than lying near, close or contiguous, but not actually touching. There are degrees of nearness, and, when you want to express the idea that a thing is immediately adjacent, you have to say so. Hanifen v. Armitage (C. C.) 117 F. 845, 851."

" 'Adjacent' [as used in a grant] does not mean adjoining, but signifies convenient, near to, or in the neighborhood. Henderson v. Long, 11 Fed. Cas. page 1084, No. 6,354."

" 'Adjacent' does not mean adjoining, but in the neighborhood of, or convenient, or near to the place specified, and a grant of land adjacent to the military boundary line of North Carolina will sustain a survey from 10 to 15 miles distant. Henderson's Lessee v. Long, 3 Tenn. (Cooke) 128, 129, Fed. Cas. No. 6,354."

" 'Adjacent' means lying close or near to, and where a turnpike act provides that if any person shall turn off or pass the gates on ground 'adjacent thereto,' etc., if he turns off at a place little more than one-half a mile from the gate it is turning off on ground adjacent to the gate, within the meaning of the act. Carrier v. Schoharie Turnpike Road, 18 Johns. (N. Y.) 56, 57."

"The phrase, 'adjacent lands,' in Act June 8, 1872, c. 354 (17 Stat. 339), which granted to the Denver & Rio Grande Railroad Company the right to take timber, etc., from public lands adjacent to its right of way, means land on which the timber, etc., was within reasonable hauling distance by wagon. Denver & R. G. R. Co. v. United States (C. C. A.) 124 F. 156, 160."

"Lands lying within three miles of the track of the Denver & Rio Grande Railroad Company are 'adjacent' lands within the meaning of Act Cong. June 8, 1872, 17 Stat. 339, and March 3, 1877, 19 Stat. 405, allowing the railroad to use timber on adjacent lands. United States v. Denver & R. G. R. Co., 11 N. M. 145, 66 P. 550, 551." 1 Words & Phrases, First Series, pp. 184, 186, 187.

■ The acquisition of the title to the surface of the 44-acre tract after the execution of the lease and the erection of the improvements gave the bankrupt no rights superior to those held under the terms of the lease.

■ Under the lease the property described in block No. 2 upon forfeiture unquestionably became the property of the lessor, Coal River Mining Company, and it seems unnecessary to quote the numerous decisions that uniformly hold to this effect.

"A clause giving to the lessor all 'improvements' placed by the tenant on the premises has been regarded as including every addition, alteration, erection or annexation made by the lessee, 'improvements' being said to be a more comprehensive term than 'fixture.' " 26 Corpus Juris, 715.

As the learned judge below well said: [1]

"The lease was forfeited on December 31, 1928, before all of the coal was mined out. The buildings and improvements on said forty-four acre tract of land were constructed by Coal River Collieries to facilitate and in furtherance of its coal operations as lessee under the coal lease from the Coal River Mining Company and before said lessee acquired any interest in the surface of said forty-four acre tract from T. T. Miller, et al. Said buildings and improvements were designed for and used solely in connection with the operations of the bankrupt under the coal lease mentioned, and, although no coal was actually mined or removed from the forty-four acre tract or the 163.68 acre tract, of which the forty-four acre tract was a part, nevertheless the lease covered both the 2172.-57 acre tract and the 163.68 acre tract, which were treated under the lessee's mining scheme as one mining proposition and designated and classed as its Mine No. 2."

---

[1] No opinion filed in court below. Quotation is from statement of facts in decree.

980

With respect to the railroad sold as block No. 3, the lease provided:

"Article 24. The lessees further expressly agree that they will construct or cause to be constructed within one year from the date hereof all railroads necessary for the properly carrying on of the said mining operations."

█ The railroad was constructed in compliance with this provision and article 10 of the lease provides that, on termination, the lessee will "leave the leased premises and improvements" in good workable condition, "so that the mining of coal may be continued by the lessor." The plain intent of this contract was in the event of forfeiture to leave the entire plant of the bankrupt so that the lessor could continue the mining of the coal remaining. The railroad was a part of the mining plant and necessary to its continued operation, and, under the lease, the title to it reverted to the lessor.

On this point the judge below held:[1]

"At the time said railroad was constructed the Coal River Collieries owned no interest of any kind in land or leases that could be served by said railroad, except the premises under lease from the Coal River Mining Company, nor has said Coal River Collieries ever used said railroad for purposes other than in connection with its operations under its coal lease from the Coal River Mining Company. The portion of the railroad and the right-of-way, or easement on which it was constructed, from Ashford to the exterior boundary of said leased premises is an indispensable part of the entire railroad extending from Ashford to the tipple situate near the center of said leased premises, is necessary for the full use and enjoyment of said leased premises as a coal mining property and, as such, became an appurtenancy to said leased premises."

"Where a permanent right of way is acquired by a tenant, as appurtenant to the demised premises, at the expiration of the tenancy it enures to the benefit of the landlord." Dempsey et al. v. Kipp, 61 N. Y. 462.

See, also, Bedlow et al. v. N. Y. Floating Dry Dock Co., 112 N. Y. 263, 19 N. E. 800, 2 L. R. A. 629; Park City Meat Co. et al. v. Comstock Silver King Mining Company, 36 Utah, 145, 103 P. 254; 37 Corpus Juris 324.

Counsel for appellee Coal River Mining Company contends that appellants do not have such an interest as gives them a right to bring this appeal and that the appeals were not properly allowed under the Bankruptcy Act (11 USCA), but in view of our conclusions on the merits we do not consider it necessary to discuss these questions.

There was no error, and the order of the court below is affirmed as to the property described in both block No. 2 and block No. 3.

Affirmed.

---

[1] No opinion filed in court below. Quotation is from decree.