## COLLEGES AND UNIVERSITIES

**PUBLIC SAFETY – THE JOHNS HOPKINS UNIVERSITY POLICE DEPARTMENT – THE EXTENT OF THE POLICE DEPARTMENT'S OFF-CAMPUS JURISDICTION – HOW COMMUNITY SUPPORT FOR THAT JURISDICTION IS DETERMINED**

May 1, 2020

*The Honorable Stephanie Smith*
*Maryland House of Delegates*

You have asked a series of questions about the Community Safety and Strengthening Act (the "Act"), a 2019 law that establishes mechanisms for the creation of a Johns Hopkins University Police Department (the "Hopkins PD"). 2019 Md. Laws, ch. 25. In particular, you have questions about the off-campus areas in which the Hopkins PD will have jurisdiction and about how that jurisdiction is to be determined.

Under the Act, Johns Hopkins University ("Hopkins" or the "University") may establish a police department via a memorandum of understanding ("MOU") with the Baltimore Police Department ("BPD") that relates to, among other things, the jurisdiction and operations of the Hopkins PD. Md. Code Ann., Educ. ("ED") §§ 24-1201(d), 24-1202(a). As to jurisdiction, the Act authorizes the Hopkins PD to exercise jurisdiction primarily on the University's "campus area," which is defined to mean all University-owned-or-operated property that is used for educational or institutional purposes and is located on the University's Homewood campus, its East Baltimore medical campus, or its Mt. Vernon Peabody campus, as well as the public property that is "immediately adjacent" to the campus, such as streets, sidewalks, and parking facilities. ED §§ 24-1201(c)(1), 24-1202(c)(2)(i)(2). In addition to that primary on-campus jurisdiction, the Act establishes a mechanism by which the Hopkins PD can obtain jurisdiction to operate beyond the defined "campus area." ED § 24-1202(c)(2). Under that mechanism, the Hopkins PD may operate "within areas adjacent to the campus area" if (1) the University "receives a majority of support from the members of the relevant campus-adjacent communities," and (2) the Baltimore City Council "approves a resolution affirming that the University has received the support required." ED § 24-1202(c)(2)(i), (ii). The "areas adjacent to the campus area" in which the Hopkins PD

will have jurisdiction must then be specified in "the executed memorandum of understanding." ED § 24-1202(c)(2)(i)(2).

Your primary questions, as we understand them, are about the meaning of the term "executed memorandum of understanding" in § 24-1202(c)(2)(i)(2) and the terms "campus-adjacent communities" and "campus-adjacent community areas" in § 24-1202(c)(2)(ii). More specifically, you wish to know: (1) whether "executed memorandum of understanding" refers to the same memorandum of understanding establishing the Hopkins PD that the University must sign with the BPD; (2) whether the terms "campus-adjacent communities" and "campus-adjacent community areas" refer to official, recognized community associations or can instead encompass areas that are broader or narrower than the borders of those community associations; and (3) how the Baltimore City Council is to determine when the University has received "a majority of support from the members of the relevant campus-adjacent communities" such that the Hopkins PD may operate in those communities.

As to your first question, our opinion is that the "executed memorandum of understanding" refers to the same MOU between the University and the BPD that establishes the Hopkins PD. As to your second question, our opinion is that the terms "campus-adjacent communities" and "campus-adjacent community areas" do not necessarily refer to official community associations. Instead, Hopkins may obtain jurisdiction over a campus-adjacent area that is either broader or narrower than the boundaries of an official community association, so long as the area is near enough to the defined "campus area" to qualify as "adjacent to the campus area," and the University receives the requisite "majority of support from the members of" each relevant "communit[y]" in that area. Finally, as to your third question, our opinion is that the University has the primary responsibility to measure support of the community members in the campus-adjacent community areas in which it seeks jurisdiction. The University must, however, demonstrate to the Baltimore City Council that it has received the affirmative support of the members of the communities in those areas, ED § 24-1202(c)(2)(ii), not simply the members of the community associations or the leadership of the community associations. As a practical matter, because the Act gives the City Council the responsibility to determine whether the University has shown that it has the support of the members of the relevant campus-adjacent communities, the University might wish to consult with the City

Council about appropriate methods for gauging and demonstrating that support.

# I
# Background

## A. *The Relevant Statutory Provisions*

As noted above, the Act authorizes Hopkins to create its own police department, subject to a number of restrictions and requirements, including that the Hopkins PD may consist of no more than 100 employees and must operate under the terms of an MOU with the BPD. ED §§ 24-1202(a), (c), 24-1203(a)(6). Your questions are primarily about the geographic jurisdiction of the Hopkins PD. That jurisdiction is largely governed by the following excerpt from the Act:

> (c)(1) Subject to paragraph (2) of this subsection, a University police officer has the powers granted to a peace and police officer.
>
> (2)(i) A University police officer may exercise these powers only:
>
>> 1. On the University's campus area; and
>>
>> 2. Subject to subparagraph (ii) of this paragraph, within areas adjacent to the campus area, as specified in the executed memorandum of understanding developed with input from the relevant community.
>
> (ii) A University police officer may exercise these powers within areas adjacent to the campus area only if:
>
>> 1. The University receives a majority of support from the members of the relevant campus-adjacent communities for the police department to operate in their communities; and
>>
>> 2. The Baltimore City Council approves a resolution affirming that the University has received the support required under item 1 of this subparagraph of the campus-adjacent community areas in which the police department is authorized to operate.

ED § 24-1202.

Under this scheme, the Hopkins PD is specifically granted jurisdiction on the University's "campus area." ED § 24-1202(c)(2)(i)(1).[1] That "campus area" is defined by the Act to mean only property: (1) that is "[o]wned, leased, operated by, or under the control of the University"; (2) that is "[u]sed for educational or institutional purposes"; *and* (3) that is "[l]ocated on":

1. The Homewood campus, meaning the area bounded by West University Parkway and East University Parkway on the north, East 28th Street and West 28th Street on the south, Remington Avenue and Stony Run stream on the west, and North Calvert Street on the east;

2. The East Baltimore campus, meaning the area bounded by East Eager Street on the north, East Baltimore Street on the south, North Caroline Street on the west, and North Castle Street on the east; or

3. The Peabody campus, meaning the area bounded by West Madison Street and East Madison Street on the north, East Hamilton Street and West Hamilton Street on the south, Cathedral Street on the west, and Saint Paul Street on the east[.]

ED § 24-1201(c)(1). The definition of "campus area" also specifically "includes the public property that is immediately adjacent to the campus," such as sidewalks, streets, and parking facilities. ED § 24-1201(c)(2).

Although one aspect of this statutory definition of "campus area" outlines the specific street boundaries of the University's Homewood, East Baltimore, and Peabody campuses, respectively, *see* ED § 24-1201(c)(1)(ii), not all of the property within those boundaries is actually part of the "campus area" as defined by the Act. Rather, property within those boundaries is only part of the

---

[1] To be clear, even though the Hopkins PD has jurisdiction on the "campus area," that does not divest the BPD of its jurisdiction. To the contrary, under the Act, the BPD retains all of its jurisdiction and must retain "primary responsibility for all investigations and arrests related to" most serious offenses and must maintain evidence collected from crime scenes in accordance with its procedures. ED § 24-1202(b).

defined "campus area" if it is *also* owned, leased, operated by, or under the control of the University and is used for educational or institutional purposes. ED § 24-1201(c)(1). In other words, the specific street boundaries in the Act set the *maximum* size to which the University's "campus area" can grow, but the "campus area" itself, as defined by the Act, is smaller and does not encompass all of the territory within those maximum boundaries. Hopkins could, in the future, expand its "campus area" by acquiring or obtaining control over additional property for educational or institutional purposes but only if that property lies within the maximum boundaries set forth in the Act.

Outside of the "campus area," the Hopkins PD may only exercise jurisdiction within areas that are "adjacent to the campus area" and, even then, only if the University receives a "majority of support from the members of the relevant campus-adjacent communities" and the Baltimore City Council passes a resolution affirming that Hopkins received the requisite support of those "campus-adjacent community areas." ED § 24-1202(c)(2)(ii).[2] The Act does not specify the outer limits of the areas that can be considered adjacent to the "campus area," and it does not otherwise define campus-adjacent areas or campus-adjacent communities. The Act is also silent as to how the support of relevant campus-adjacent communities is to be measured.

### B. *Legislative History*

The University employs over 1,100 full-time security personnel, consisting of more than 1,000 security officers and 63 Special Police Officers,[3] all of whom are unarmed. *See* Interim Study on Approaches to Improving Public Safety on and around Johns Hopkins University Campuses – Report to the Maryland General Assembly on H.B. 1803 at 9 (Dec. 21, 2018) ("Interim Study"). These security personnel patrol the University's

---

[2] The Act permits a Hopkins PD officer to operate in other off-campus areas only in limited circumstances, including when the officer is "[e]ngaged in fresh pursuit of a suspected offender," is directing traffic to or from a campus area, or is requested to do so by the Mayor of Baltimore City or the Governor in certain emergency situations. ED § 24-1202(c)(2)(iii).

[3] In Maryland, Special Police Officers hold a commission granted by the Governor authorizing them to exercise certain police powers, generally only on the private property described in their commission. *See* Md. Code Ann., Pub. Safety § 3-307.

campuses and certain "patrol zones" that are near the campuses. *See* Interim Study, Appendix B (setting out the boundaries of those current "patrol zones"). According to Hopkins, the drawback to this current system of security is that, although these security personnel conduct patrols and act as "eyes and ears" detecting and reporting crime, they are not authorized to intervene in criminal acts to the same extent as sworn police officers. Interim Study at 9.

The Legislature first considered authorizing the University to create a police department during the 2018 session. *See* H.B. 1803, 2018 Leg., Reg. Sess. That legislation would have authorized Hopkins to establish a campus police force "based on a memorandum of understanding entered into by the institution and the Mayor or the Police Commissioner of Baltimore City." H.B. 1803, 2018 Leg., Reg. Sess. (First Reader). The bill would also have permitted a Hopkins PD officer to operate only "on property that is owned, leased, operated by, or under the control of" the University, but it did not mention jurisdiction on campus-adjacent areas. *Id*. Although that bill received a hearing in the House Judiciary Committee, "[i]t became clear that there was insufficient support to move forward with the bill at that time," and the University agreed to conduct further study on the matter. Interim Study at 13. Specifically, the Chair of the House Judiciary Committee requested that the University "undertake an interim review and community engagement process" by "soliciting additional input from students, faculty, staff, neighbors, and guests to their several campuses" and by "working with relevant stakeholders" to research the experiences and best practices of other universities. Letter from Delegate Joseph F. Vallario, Jr., Chair, House Judiciary Committee, to Ronald J. Daniels, President, The Johns Hopkins University (April 17, 2018).

Shortly before the 2019 session, Hopkins submitted its Interim Study to the Legislature. Among other things, the Interim Study reported that, although "[t]he jurisdiction of university police departments at urban peers varies," "it is common for departments in densely populated areas to have primary jurisdiction on their property and concurrent jurisdiction with the local police department—agreed through an MOU—for portions of the neighborhoods nearby their campuses." Interim Study at 21 (punctuation altered). Noting that the police departments of the University of Baltimore, the University of Maryland, Baltimore,

and other urban universities had such arrangements,[4] the Interim Study stated that "this concurrent jurisdiction is viewed as a benefit to both the communities within the university patrol area—because the university officers can back up and assist local officers in an emergency—and to communities beyond the patrol area—because it frees local police departments from focusing on campus issues and permits them to commit more time and resources to neighborhood patrol." *Id.* (punctuation altered).

The Interim Study concluded that Hopkins should again seek legislation authorizing it to establish a police department through an MOU with Baltimore City. *Id.* at 51. The MOU "would set out operational agreements between the entities, including the specific area of concurrent jurisdiction." *Id.* As to jurisdiction, Hopkins recommended that its police force would have "primary jurisdiction on all the buildings and grounds" of its campuses and that it would "work with the city, through the MOU process, to have concurrent jurisdiction with BPD within a limited area beyond those boundaries." *Id*. Hopkins envisioned that this "limited area" of jurisdiction beyond its campus boundaries would include its "current patrol zone" as well as "additional streets where warranted, based on community input" and staffing capability. *Id.*

During the subsequent legislative session, the Act was introduced by Senator Hayes, of Baltimore, as Senate Bill 793. As introduced, that bill authorized Hopkins to establish a police department "based on a memorandum of understanding," which, in turn, meant "an agreement between [Hopkins] and the Baltimore Police Department regarding matters related to police jurisdiction and operations." S.B. 793, 2019 Leg., Reg. Sess. (First Reader). The bill provided that a Hopkins PD officer could operate only "on the University's campus area[] and concurrently with the Baltimore Police Department, within areas adjacent to the campus area, as specified in an executed memorandum of understanding developed with input from the relevant community." *Id.* (numbering omitted). The term "campus area" was defined as "any property that is: owned, leased, operated by, or under the control of the University in the Homewood, East Baltimore, and Peabody campuses of the University; and used for educational or institutional purposes." *Id.*

---

[4] The University of Maryland Police Force is authorized to operate "on property that is owned, leased, operated by, or under the control of the University," but may operate on other property if "[r]equested or authorized to do so by the chief executive officer or chief police officer of any county." ED § 13-601(b)(2).

(numbering omitted). The term also included "the public property that is adjacent to the campus, including: a sidewalk, a street, or any other thoroughfare; and a parking facility." *Id.* (numbering omitted).

Early in the session, the Senate Judicial Proceedings Committee held a hearing on the bill. *See Hearing on S.B. 793 Before the Senate Jud. Proc. Comm.* (Feb. 22, 2019). The Committee heard testimony from Hopkins officials who supported the bill, as well as testimony on both sides from representatives of neighborhoods, community associations, and business associations located near the University's campuses. *Id.* At one point, Senator Washington, of Baltimore, asked the University's President, Ronald Daniels, about the anticipated patrol zones of Hopkins PD officers. President Daniels answered:

> [The bill] gives Hopkins a right to patrol in its Clery boundaries,[5] but anything beyond that . . . would only be with community organizations that are welcoming that want us there. Senator Washington, we don't want to be in any community that's contiguous to us if they don't want us there.

*Id.*

After the hearing, the Committee suggested several amendments to the bill, which were adopted by the Senate without debate. *See* Amendments to S.B. 793 by the Jud. Proc. Comm.;

---

[5] The so-called "Clery Act," as interpreted by the U.S. Department of Education, requires institutions of higher education to annually disclose campus security policies and statistics on crimes occurring on campus and on public property immediately adjacent to the campus. *See* 20 U.S.C. § 1092(f)(1)(F) and (f)(6)(A)(iv) (defining "public property" as "all public property that is within the same reasonably contiguous geographic area of the institution, such as a sidewalk, a street, other thoroughfare, or parking facility, and is adjacent to a facility owned or controlled by the institution if the facility is used by the institution in direct support of, or in a manner related to the institution's educational purposes."); *see also* 34 C.F.R. § 668.46(a) (defining "Clery geography" as including "[p]ublic property within or immediately adjacent to and accessible from the campus."). As we understand it, the definition of "campus area" in the Act was largely intended to track the University's Clery boundaries, at least for the three Hopkins campuses covered by the Act.

Senate Proceedings No. 45 (March 13, 2019). The amendments, in relevant part, clarified that only University-controlled property within certain maximum street boundaries would constitute the "campus area." The amendments also added the subparagraph about campus-adjacent jurisdiction at issue here, requiring community support and City Council approval before the Hopkins PD may exercise jurisdiction on "areas adjacent to the campus area." *Id.* The amendments also substituted the word "the" for "an" in referencing "the" executed memorandum of understanding that must specify any "areas adjacent to the campus area" in which a Hopkins PD officer may patrol. *Id.* (amending ED § 24-1202(c)(2)(i)).

The Senate passed Senate Bill 793 as amended. *See* Senate Proceedings No. 46A (March 14, 2019). During the floor debate on the bill, Senator Washington had proposed an amendment to restrict the Hopkins PD to operating within its Clery boundaries. *See* Senate Proceedings No. 45 (March 13, 2019). Senator McCray, of Baltimore, responded that the amendment was not necessary because "they"—presumably the Baltimore Senators—had worked hard to arrive at the bill's definition of "campus area" as limited to campus properties. He went on to explain that "if [the Hopkins PD] had to go into another piece of the neighborhood they would have to get a City Council resolution for those adjacent neighborhoods." *Id.* Senator Washington's amendment was rejected.

After passage by the Senate, the bill moved to the House, where it was amended, in pertinent part, to clarify that the term "campus area" includes public property that is "*immediately* adjacent" to the campus, such as streets, sidewalks, and parking garages. *See* Floor Amendment of Delegate Clippinger, S.B. 793 (March 27, 2019) (emphasis added); *see also* ED § 24-1201(c)(2).[6]

---

[6] A House Judiciary Committee amendment adopted the previous day had erroneously added the word "immediately" in front of "adjacent" in the section dealing with campus-adjacent jurisdiction, such that a University police officer could operate "within areas *immediately* adjacent to the campus area" if the University receives a majority of support from the members of the relevant campus-adjacent community. *See* House Judiciary Comm. Amendments, S.B. 793 (March 26, 2019) (emphasis added). The next day, the Committee chairman explained on the floor that the word "immediately" was actually "meant to be [inserted] in front of the word 'adjacent' in the . . . campus area" definition so as to apply to the property immediately adjacent to the campus area, such as streets and sidewalks. *See* House Proceedings No.

During the House's floor debate on the bill, Delegate Branch, of Baltimore, explained that he was voting in favor of the bill "for a major reason: . . . [Hopkins] has worked with the community and talked with the nearby communities, and . . . most of them have said yes. . . . And for those that did say no, the [University] is going to respect that, they're not going in." House Proceedings No. 55 (March 28, 2019). The bill passed the House, and the Senate concurred in the House's amendments without further debate. *See* Senate Proceedings No. 58 (April 1, 2019).

## II
## Analysis

You have asked a series of questions about the jurisdiction of the Hopkins PD. Because these questions are all matters of statutory interpretation, our ultimate goal is to "discern and carry out the intent of the Legislature." *Blue v. Prince George's County*, 434 Md. 681, 689 (2013). Like the Maryland courts, "we begin with the normal, plain meaning of the statute," *State v. Bey*, 452 Md. 255, 265 (2017) (internal quotation omitted), giving the statute's text its "ordinary meaning," *Blue*, 434 Md. at 689 (internal quotation omitted). "Where the words of a statute are ambiguous and subject to more than one reasonable interpretation," we examine other indicia of legislative intent, *Bey*, 452 Md. at 266, including "the statutory text in context," the "legislative history," and "the consequences of alternative readings," *Blue*, 434 Md. at 689.

With those principles in mind, we will first address your question about the meaning of the term "executed memorandum of understanding" in ED § 24-1202(c)(2)(i)(2). We will then move on to your questions about the meaning of "campus-adjacent communities" and "campus-adjacent community areas" in ED § 24-1202(c)(2)(ii). Finally, we will address your related question about how community support for the Hopkins PD's off-campus jurisdiction is to be measured.

### A. *The Meaning of the "Executed Memorandum of Understanding"*

We begin with your question about the meaning of the term "memorandum of understanding" in § 24-1202(c)(2)(i)(2), which

---

54 (March 27, 2019). This floor amendment thus corrected the error in the prior committee amendment.

requires that the "areas adjacent to the campus area" where the Hopkins PD is to have jurisdiction must be "specified in the executed memorandum of understanding." In our view, the "memorandum of understanding" to which this provision refers is the same "memorandum of understanding" referred to in § 24-1202(a), i.e., the agreement between the University and the BPD through which the University establishes its police department. We reach that conclusion for three reasons.

First, the Act itself defines the term "memorandum of understanding" as "an agreement between the Johns Hopkins University and the Baltimore Police Department regarding matters related to police jurisdiction and operations." ED § 24-1201(d). Ordinarily, "[w]hen a statute specifically defines a word for the purposes of the whole title, the word should have uniform application throughout." *Gambo v. Bank of Maryland*, 102 Md. App. 166, 184 (1994). We thus presume that the Legislature intended the term "memorandum of understanding" in both § 24-1202(a) and § 24-1202(c)(2)(i)(2) to mean the same thing: "an agreement between the Johns Hopkins University and the Baltimore Police Department regarding matters related to police jurisdiction and operations." ED § 24-1201(d).

Second, the statute's overall structure confirms that § 24-1202(c)(2)(i)(2) refers to the same MOU called for in § 24-1202(a). The latter section specifies that Hopkins is permitted to establish a police department by entering into an MOU, which, as discussed, means an agreement between Hopkins and the BPD "regarding matters related to police jurisdiction and operations." ED § 24-1201(d). Because specifying the areas adjacent to the campus area where the Hopkins PD will have jurisdiction is a "matter[] related to police jurisdiction," it makes sense that those areas would be specified in the MOU that establishes the Hopkins PD. *See also* Interim Study at 51 (explaining that the MOU between the University and the BPD "would set out operational agreements between the entities, *including the specific area of concurrent jurisdiction*" (emphasis added)).

Third, and finally, § 24-1202(c)(2)(i)(2) was amended during the legislative process to refer to "*the* executed memorandum of understanding," rather than just "an" executed memorandum of understanding. *See* Amendments to S.B. 793 by the Senate Jud. Proc. Comm. (emphasis added). That amendment suggests that the off-campus areas within which the Hopkins PD is to have

jurisdiction should be specified in "the" MOU referred to elsewhere in the Act, rather than in some other MOU.[7]

## B.    The Hopkins PD's Jurisdiction in Campus-Adjacent Areas

We next address your questions about the extent of the Hopkins PD's off-campus jurisdiction and the meaning of the terms "campus-adjacent communities" and "campus-adjacent community areas." In particular, you wish to know whether those terms refer to the boundaries of official community associations or, instead, whether the relevant "communities" or "community areas" for purposes of determining the Hopkins PD's off-campus jurisdiction can be broader or narrower than the boundaries of those community associations.

To answer these questions, we begin with the language of the statute. According to that language, the Hopkins PD may operate in "areas adjacent to the campus area" if the University receives "a majority of support from the members of the relevant campus-adjacent communities" and the City Council "approves a resolution affirming that the University has received" the requisite support "of the campus-adjacent community areas in which the police department is authorized to operate." ED § 24-1202(c)(2)(ii). Although the General Assembly used three slightly different phrases to describe the off-campus areas over which the University can acquire jurisdiction—"areas adjacent to the campus area," ED § 24-1202(c)(2)(i)(2), "campus-adjacent communities," ED § 24-1202(c)(2)(ii)(1), and "campus-adjacent community areas," ED § 24-1202(c)(2)(ii)(2)—the context suggests that those similar phrases, used as part of a single interrelated scheme for determining the extent of the Hopkins PD's off-campus jurisdiction, were intended to be construed harmoniously. *See, e.g., Whack v. State*, 338 Md. 665, 673 (1995) (explaining that statutory provisions "that involve the same subject matter, have a common purpose, and form part of the same system" should be read "in pari materia" and construed "harmoniously"); *see also Trail v. Terrapin Run, LLC*,

---

[7] We do not mean to suggest that the memorandum of understanding could not be amended to specify additional areas of campus-adjacent jurisdiction in the future, if Hopkins later goes through the process to obtain jurisdiction over those additional areas. In fact, the statute envisions "a process to consider community or University requests for additional jurisdiction for the police department." ED § 24-1203(a)(3)(ix)(2).

403 Md. 523, 532 (2008), *superseded by statute on other grounds* (explaining that, although "different words or phrases may connote different meanings," a statute's words "must be viewed in context to determine if the choice of a particular word or phrase, as compared to a similar word or phrase, represents a semantical difference or a substantive difference" (citation omitted)). What, then, do those phrases mean?

Because the Act does not provide a definition for any of those phrases, we start with the one term that the Act does define: "campus area." That term, as we have explained, means property that is "[o]wned, leased, operated by, or under the control of the University," that is "[u]sed for educational or institutional purposes," *and* that is located within the maximum geographic boundaries of either the University's Homewood campus, East Baltimore campus, or Peabody campus, as well as the "public property that is immediately adjacent to the campus," such as sidewalks, streets, or parking facilities. ED § 24-1201(c). Thus, when the statute refers to "the campus area" or the "campus" in delineating the Hopkins PD's jurisdiction, it means only those areas within the boundaries of the larger Homewood, East Baltimore, or Peabody campuses that are actually "[o]wned, leased, operated by, or under the control of the University" and that are "[u]sed for educational or institutional purposes," plus the public property immediately adjacent to that University-controlled property. *See* Letter of Paul Pineau, General Counsel, The Johns Hopkins University, to Patrick Hughes, Chief Counsel, Opinions and Advice, Office of the Attorney General, Appendix A (Oct. 2, 2019) ("Hopkins Letter") (offering the same reading of the statute).[8] The other areas that are within the maximum geographic boundaries of the three campuses—as well as the areas outside those boundaries—are *not* part of the "campus area" as defined by the Act. Instead, those other areas can only be added to the Hopkins PD's jurisdiction if they qualify as "areas adjacent to the campus area" and the University satisfies the statute's community-support requirements for those areas.

Now that we know the meaning of "campus area" and "campus" in this context, the next step is to interpret the word

---

[8] The University's General Counsel submitted comments to our Office about this opinion request in accordance with our ordinary practice to post pending opinion requests on our website and accept comments on those requests from any interested parties. We did not receive any other comments.

"adjacent" in relation to that defined area. The definition of "adjacent" depends on context; its meaning is "relative," and it can have "different meanings depending on the connection" being described "and the subject" of that connection. *Jacobs Concessions v. United States Fid. & Guar. Co*., 181 Md. 113, 116 (1942). In some cases, "adjacent" can mean "contiguous" or "adjoining," such that the property or area in question must actually touch or border another property or area to qualify as "adjacent." *E.g.*, *Calvert Joint Venture # 140 v. Snider*, 373 Md. 18, 28 n.6 (2003) (examining dictionary definitions and noting that "[a]djacent is described as a synonym of adjoining," which means "being in contact at some point or line; bordering; contiguous" (internal quotation marks and citations omitted)); *City of Elkhorn v. City of Omaha*, 272 Neb. 867, 885 (2007) (noting "that the terms contiguous and adjacent in annexation statutes are synonymous"); *see also Webster's New Universal Unabridged Dictionary* 25 (2001) (defining "adjacent" as "lying near, close, *or contiguous*; *adjoining*; neighboring" (emphasis added)).

More often, however, courts seem to "draw a distinction between the terms 'adjoining' and 'adjacent to,'" interpreting adjoining to mean contiguous and interpreting adjacent to mean nearby but not necessarily touching. *Gruver-Cooley Jade Corp. v. Perlis*, 252 Md. 684, 695 (1969) (explaining that the word "adjoining," "[i]n its etymological sense, and according to the more approved definitions . . . means abutting, contiguous, having a common boundary, in contact with, lying next to or in contact with *. . . as distinguished from lying near or adjacent*" (internal quotation marks omitted) (emphasis added)); *see City of Baltimore v. Williams*, 129 Md. 290 (1916) ("[W]hen you want to express the idea that a thing is immediately adjacent you have to say so" (internal quotation marks omitted)); *see also, e.g., Superior Steel Products Corp. v. Zbytoniewski*, 270 Wis. 245, 247 (1955) ("The word 'adjacent' in its ordinary usage means 'near to' or 'close to,' *but does not imply actual physical contact* as do the words 'adjoining' or 'abutting.'" (emphasis added)); *Black's Law Dictionary* 50 (11th ed. 2019) (defining "adjacent" as "[l]ying near or close to, but not necessarily touching"). For example, in the municipal zoning context, "adjacent" typically indicates the close geographical proximity of two parcels of land but not necessarily the contiguity of those parcels. *See* Baltimore City Code, Art. 32, § 1-302 (e), (f) (in the Zoning Code, defining "adjacent" to mean "to lie near, close to, or in the vicinity of," and distinguishing it from "adjoining," which means "to touch, abut, or border on").

Even under that more common understanding, however, there are "degrees of nearness." *Williams*, 129 Md. at 290; *see also Brotherhood Inv. Co. v. Coal River Min. Co.*, 46 F.2d 976, 979 (4th Cir. 1930). For instance, the term adjacent is sometimes used to indicate that two things are "near" one another because they are not separated by an object of the same kind, even if something else separates them. *See, e.g.*, *Grandview Lot Owners Ass'n, Inc. v. Harmon*, 754 N.E.2d 554, 559 (Ind. Ct. App. 2001) (interpreting "adjacent" in a restrictive covenant to "require a special kind of physical proximity, but not necessarily a touching," so long as the object in question is the "nearest of its kind to the other object in question," and finding that a lot just across the road from a lake was not adjacent to the lake because another lot was in between); *City of St. Ann v. Spanos*, 490 S.W.2d 653, 656 (Mo. App. 1973) (interpreting the word "adjacent" in an annexation statute, and explaining that, although the dictionary's definition of "adjacent" includes the concept of nearness, "the word near [in that definition] is qualified by the phrase 'having nothing of the same kind intervening'"). But, in other contexts, the term adjacent is used to encompass things that are further away from each other, but still relatively nearby. *See, e.g., Williams*, 129 Md. at 290 (finding that a section of roadway one-half to three-quarters of a mile away from the water front was adjacent to the water front because it effectuated the legislative intent to "promote the accessibility of such water front"); *Brotherhood Inv. Co.*, 46 F.2d at 979 (collecting examples of more distant forms of adjacency, including land within three miles of a railway track and ground more than half a mile from a turnpike gate).

This survey suggests that the meaning of "adjacent" is highly dependent on context. In the context that concerns us here—§ 24-1201(c)(2) of the Act—the word "adjacent" describes the geographic relationship between the campus area and the off-campus areas within which the Hopkins PD is permitted to operate. A threshold question, then, is whether "adjacent" in this context means that the off-campus areas proposed for Hopkins PD jurisdiction must actually adjoin the campus area or need only be located *near* the campus area without necessarily touching a part of the campus area. Although the Act does not provide any clear guidance on that threshold point, we do not think it establishes a bright-line rule that campus-adjacent areas proposed for Hopkins PD jurisdiction must adjoin, i.e., touch, the campus area. Instead, it is more likely that the Legislature used the word "adjacent" in its more typical and more general sense, as denoting nearness. *Accord* Hopkins Letter at 4 (arguing that the Legislature intended for the term "adjacent" as used in § 24-1202(c)(2) "to encompass areas

nearby, but not necessarily contiguous with, the 'campus area'"). We reach that conclusion for a few reasons.

First, in defining "campus area," the General Assembly explicitly included the "public property that is *immediately* adjacent to the campus," such as streets, sidewalks, other thoroughfares, and parking facilities. ED § 24-1201(c)(2) (emphasis added). Because the Legislature used the phrase "immediately adjacent" in that provision to describe the public property that actually *adjoins* the University-owned campus property, its use of the word "adjacent," without the modifier "immediately," in § 24-1202(c)(2) suggests that it did not intend to require strict contiguity for the other campus-adjacent areas in which the Hopkins PD might operate. *See Williams*, 129 Md. at 290 (explaining that "when you want to express the idea that a thing is immediately adjacent, you have to say so" (internal quotation marks and citation omitted)); *Brotherhood Inv. Co.*, 46 F.2d at 979 (same).[9]

Second, the Legislature apparently envisioned that the Hopkins PD might have jurisdiction over non-contiguous parcels of land even as part of its "campus area." Under the definition of "campus area," there are parcels within both the Homewood campus and the East Baltimore campus that do not adjoin other University property within those campuses, resulting in "islands" in which the Hopkins PD has jurisdiction. *See* Hopkins Letter, Appendix A (mapping out the properties that fall within the definition of "campus area" and showing those islands of jurisdiction). And other property within the maximum boundaries of those campuses could also become such islands in the future, if Hopkins acquires the property and uses it for educational or institutional purposes. *See* ED § 24-1201(c)(1). Although Hopkins

---

[9] The legislative history does not provide much clarity. To be sure, the Hopkins President mentioned in passing during the hearings on the bill that Hopkins would not "want to be in any community that's *contiguous* to us if they don't want us there." *Hearing on S.B. 793 Before the Senate Jud. Proc. Comm.* (Feb. 22, 2019) (emphasis added). But there are also references in the legislative history that could support the broader meaning of "adjacent," as meaning simply "nearby." *See* House Proceedings No. 55 (March 28, 2019) (statement of Delegate Branch) (explaining that he was voting for the bill because he was contented that Hopkins had "worked with and talked with the *nearby* communities," and "most of them have said yes" (emphasis added)).

could attempt to connect those islands to its other areas of jurisdiction by seeking off-campus jurisdiction to police the areas in between the islands and the rest of the "campus area," the existence of those islands suggests that the Legislature was not concerned with strict contiguity, in either the on-campus or off-campus areas of Hopkins PD jurisdiction.

Finally, given the varied urban settings of the University's campuses, the Legislature might have wanted the Hopkins PD to be able to obtain jurisdiction over a nearby off-campus area that is separated from campus by property that does not warrant jurisdiction. For example, a particular off-campus residential area that houses a number of University students might be separated from the campus area by property without the same sort of connection to the University or its students. In those situations, the Hopkins PD might want to obtain jurisdiction over the student residential area but not the property in between that area and the campus. We think it unlikely the Legislature precluded this possibility by requiring a nearby off-campus patrol area to be strictly contiguous with the campus area.

Of course, the quality of being nearby "cannot be reduced to mathematical measurement." *Ray v. Mayor & City Council of Baltimore*, 203 Md. App. 15, 34 (2012), *aff'd*, 430 Md. 74 (2013). At the risk of stating the obvious, the degree of adjacency to campus diminishes the farther away an area is from the campus border; a neighborhood block that adjoins the campus area is clearly adjacent to the campus, while one several blocks away has less claim to that description. *See id.* at 33-34 (recognizing, in the zoning context, that there may be a "proximate impact" on property that is nearby, but not contiguous to or abutting, other property, but that the "quality of being 'nearby'" diminishes with distance). But unlike with the boundaries of the campus area, the Act does not specify any maximum boundaries for the campus-adjacent areas in which the Hopkins PD may operate. Thus, it is not possible to draw with precision the outer boundaries of the areas "adjacent to the campus area" in which Hopkins can seek to obtain jurisdiction. In fact, the General Assembly likely used the term "adjacent," rather than specifying exact boundaries, so as to provide the University and the City with some flexibility in determining which off-campus areas should be proposed for campus-adjacent jurisdiction, based on the needs of the University and the desires of the surrounding communities. *See* Interim Study at 51 (explaining that the "limited area" of jurisdiction beyond the University's campus boundaries, "where warranted," would be based on the University's capabilities and "community input").

At a minimum, the off-campus areas within the University's "current patrol zone"—i.e., the areas currently patrolled by University security personnel, *see* Interim Study, Appendix B— would probably qualify as campus-adjacent. The University specifically noted in its Interim Study, which was submitted to the Legislature and served as the basis of the Act, that its "limited area" of off-campus jurisdiction would include its "current patrol zone," Interim Study at 51, which generally extends no farther than 6 to 8 blocks in any one direction from the Homewood campus boundary and no more than 3 or 4 blocks from the campus boundary around the East Baltimore campus. *See* Interim Study, Appendix B.[10] Although those patrol zones might not be the outer boundaries of what would be considered adjacent to the campus—the University, after all, also said in its Interim Report that it might seek jurisdiction on "additional streets" beyond its current patrol zones "where warranted, based on community input and an assessment of [its] staffing capability," Interim Study at 51—it seems likely that, at the very least, the Legislature would have understood the then-existing patrol zones to be "areas adjacent to the campus area."

As for any further expansion of the Hopkins PD's jurisdiction beyond the University's current patrol zones, the most we can say is that, while the term "adjacent" allows for some flexibility, it also imposes a meaningful requirement that the off-campus areas in which Hopkins seeks to obtain jurisdiction must have a certain proximity to the defined campus area. *Cf. Ray*, 203 Md. App. at 34 (explaining that the quality of being "nearby" is a "'close-in' thing and not a 'distant' thing" and "not a mere technical qualification"). Although the extent of that proximity is not strictly defined, such areas must be near enough to the campus to justify an expansion of Hopkins PD jurisdiction therein, even if those areas do not necessarily touch the campus area. The more distant an area proposed for campus-adjacent jurisdiction, the less likely that such a connection exists. In the end, such an analysis can only be done on a case-by-case basis. But there are checks built into the process to ensure that Hopkins does not go too far afield: the members of

---

[10] Apparently, Hopkins does not have a patrol zone around its Peabody campus in Baltimore's Mt. Vernon neighborhood. *See* Interim Study, Appendix B. For that campus, it seems likely that, at the very least, the areas within the maximum geographic street boundaries of the campus under ED § 24-1201(c)(1)(ii)(3) would qualify as "adjacent to the campus area."

the relevant communities within those proposed areas must approve the extension of Hopkins PD jurisdiction into their communities, and the City Council must confirm that the University has received that approval.

In any event, based on our understanding of "campus-adjacent," we are finally in a position to consider the meaning of "campus-adjacent communities" and "campus-adjacent community areas" as those terms are used in the provision requiring the University to receive "a majority of support from the members of the relevant campus-adjacent communities" before the Hopkins PD may operate in those community areas. You specifically ask whether the term "campus-adjacent communities" here refers to the established community associations within the campus-adjacent areas proposed for Hopkins PD jurisdiction or to something else.

In our view, the term "campus-adjacent communities" refers to the communities within the particular "areas adjacent to the campus area" in which the Hopkins PD is seeking to obtain jurisdiction, and not *per se* to official community associations or to the boundaries of such associations. If the General Assembly had intended "campus-adjacent communities" to mean official community associations, it could have easily said so. In fact, the Legislature explicitly used the term "community associations" elsewhere in the Act, providing that the University must give advance notice of certain public forums by "e-mailing and mailing a notice to University affiliates *and community associations* that are in proximity to the campuses." 2019 Md. Laws, ch. 25, § 3 (emphasis added). But the Legislature did not do so here; instead, it chose the more general terms "communities" or "community areas." And the word "[c]ommunity" is typically defined broadly to mean members who "reside in a specific locality," or "a locality inhabited by" certain members that is "distinct in some respect from the larger society within which it exists." *Webster's New Universal Unabridged Dictionary* at 414. Based on that ordinary understanding, the terms "campus-adjacent communities" and "campus-adjacent community areas" would not be limited to official, recognized community associations.

There would also be practical problems in equating "campus-adjacent communities" with community associations. As an initial matter, not all of the areas adjacent to the campus area will always be part of an existing, recognized community association, and some campus-adjacent areas might fall into more than one association. Similarly, in some cases, it might be difficult to determine the

community association—or associations—in which a particular campus-adjacent area is located; Baltimore has more than 250 neighborhoods and even more community associations, many with overlapping boundaries.[11] And, perhaps most fundamentally, it is not clear that all of the areas within the boundaries of a particular community association will be near enough to the campus to qualify as "adjacent to the campus area." Because some community associations cover large geographic areas, it is possible that some blocks within a community association will be adjacent to the campus area while others will not. It thus seems unlikely that the Legislature intended to force Hopkins to use the boundaries of community associations when deciding where to seek off-campus jurisdiction.

To be sure, the Legislature recognized that the larger communities beyond the specific "campus-adjacent areas" proposed for Hopkins PD jurisdiction will have an interest in the University's police department. *See, e.g.,* ED § 24-1205 (explaining that the purpose of the University Police Accountability Board, which must be established in tandem with the establishment of the Hopkins PD, is to "[e]nable community members to share community concerns regarding the police department"); 2019 Md. Laws, ch. 25, § 3 (requiring the University, before executing the MOU with the BPD, to host at least two public forums to present the proposed MOU). However, in using the phrase "members of the relevant campus-adjacent communities," instead of "members of the relevant community associations," when describing the process for Hopkins to obtain off-campus jurisdiction, it appears that the Legislature intended to focus on the particular locales that are directly affected by that jurisdiction, not on the official community associations of which those locales may be part.

Thus, in our view, the "campus-adjacent community areas" in which Hopkins seeks off-campus jurisdiction need not have the same borders as official community associations. That means, as a

---

[11]   *See, e.g.*, Live Baltimore, Neighborhoods, https://livebaltimore.com/neighborhoods/; Baltimore City Department of Planning, Community Association Directory, http://cityservices.baltimorecity.gov/cad/; Baltimore City Department of Planning, Maps Gallery, http://cityview.baltimorecity.gov/planning maps/index.html#/.

practical matter, that the community areas in which Hopkins seeks to obtain campus-adjacent jurisdiction may comprise pockets of larger community associations or may encompass parts of more than one community association. That makes sense from an operational standpoint because the University's security needs in a particular campus-adjacent area will be informed by factors unrelated to community association (or even neighborhood) boundaries. *See* Hopkins Letter at 4 (explaining that the boundaries of the Hopkins PD's campus-adjacent jurisdiction "may be set across parts of different neighborhoods or communities, or cover portions of a broader neighborhood or community" based on "crime trends," "deployment needs," "resource allocations," and "the needs of affected residents"). For example, the map of the University's current patrol zone around its Homewood campus shows that Hopkins patrols only portions of several neighborhoods, including Remington, Charles Village, Oakenshawe, and Abell. *See* Interim Study, Appendix B.

That approach also makes sense from a fairness perspective. If, for example, Hopkins wants to exercise jurisdiction over only a small area within the boundaries of a community association and the members of the community in that small part support jurisdiction, it seems unfair to require that a majority of the members of the entire community association agree to that jurisdiction. After all, the will of the majority of community members within the broader community association might not be the same as the will of the majority of members within the specific area proposed for jurisdiction, the members of which are more directly affected. It is therefore our opinion that the terms "campus-adjacent communities" and "campus-adjacent community areas" do not necessarily refer to official community associations and may have borders that are broader or narrower than those existing associations.

To be clear, however, that does not mean that Hopkins has unfettered discretion to combine two or more unrelated areas together as part of a single "campus-adjacent community area" and then measure majority support in that entire area, rather than in each relevant community within the larger area. To be a single campus-adjacent community or community area, the area in question must still be a "community" within the ordinary understanding of that term; that is, it must constitute a "specific locality" that is "distinct in some respect from the larger society within which it exists." *Webster's New Universal Unabridged Dictionary* at 414. Although the boundaries of existing neighborhoods and community associations will not always be

dispositive as to whether a particular area that has been proposed for off-campus jurisdiction is part of a single "community," those borders are at least relevant to that determination.

Thus, when an area proposed for off-campus jurisdiction cuts across recognized community association or neighborhood lines, special care should be taken to determine whether that area can be considered part of a single "campus-adjacent communit[y]" for purposes of gauging community support or whether, instead, the area includes more than one "community." After all, it is clear from the legislative history that Hopkins would need to obtain the support of each separate off-campus community in which it seeks to operate and that the Hopkins PD would not be able to operate in a community without support from that particular community. *See* Senate Proceedings No. 45 (March 13, 2019) (statement of Senator McCray, explaining that if the Hopkins PD was going to operate outside of the campus area, the University "would have to get a City Council resolution for those adjacent neighborhoods"); House Proceedings No. 55 (March 28, 2019) (Delegate Branch explaining his satisfaction that "[Hopkins] has worked with the community and talked with the nearby communities," and won't seek jurisdiction in those that "say no"); *Hearing on S.B. 793 Before the Senate Jud. Proc. Comm.* (Feb. 22, 2019) (President Daniels testifying that the University "[doesn't] want to be in any community that's contiguous to us if they don't want us there").

To be sure, Hopkins can obtain jurisdiction over an area that comprises more than a single community, but it will need a majority of support from the members of each of the relevant communities within that area. Ultimately, the determination of whether an area proposed for off-campus jurisdiction includes more than one community can only be made on a case-by-case basis, depending on the nature of the particular area. The City Council will thus have to judge (as part of the process discussed more in the next section) whether Hopkins has combined more than one separate "campus-adjacent communit[y]" into a single area proposed for Hopkins PD jurisdiction and, if so, whether Hopkins has obtained sufficient support from each of the communities within that area. *See* ED § 24-1202(c)(2)(ii)(2).

## C. *Demonstrating Campus-Adjacent Community Support*

Finally, we address your questions about the process for the relevant campus-adjacent communities to demonstrate their support for the Hopkins PD to operate in their communities. You

ask, in particular, who is supposed to measure whether the majority of community members support Hopkins PD jurisdiction and what will count as sufficient indication of that support.

In our view, the Act largely leaves those questions to the Baltimore City Council to resolve.    Rather than provide any explicit guidelines about how to gauge whether there is a majority of support from the members of the relevant campus-adjacent communities, the Act simply provides that, before the Hopkins PD may operate in any campus-adjacent community, "[t]he Baltimore City Council" must "approve[] a resolution affirming that the University has received the support required" in that community. ED § 24-1202(c)(2)(ii)(2).    That requirement for City Council approval suggests that the Legislature wanted the City Council to work with the University to ensure the Hopkins PD has the support of a campus-adjacent community before operating in that community.  Indeed, just as the Legislature declined to specify the particular campus-adjacent areas in which the Hopkins PD could operate—but instead left that to the public MOU process—so too did it defer to the City Council in determining whether Hopkins had received the required support of those areas.  *See*, *e.g.*, Senate Proceedings No. 45 (March 13, 2019) (statement of Senator McCray, explaining during the floor debates that if the Hopkins PD was going to operate outside of the campus area, the University "would have to get a City Council resolution for those adjacent neighborhoods").   Nonetheless, to the extent possible, we will endeavor to provide some general guidance.

As to who is responsible for measuring community support, both the text and the legislative history of the Act make clear that the University bears the primary responsibility.  The Act speaks in terms of the *University* receiving the requisite community support, *see* ED § 24-1202(c)(2)(ii)(1), and explicitly gives the University responsibility for other MOU-related community-engagement processes.    *See* 2019 Md. Laws, ch. 25, § 3 (requiring the University, before executing the MOU with the BPD, to take a number of steps, including hosting at least two public forums and providing notice of those forums to community associations). What is more, the University specifically told the Legislature when advocating for the bill that it would bear the burden to develop the process for measuring community support and to prove that it has obtained the requisite support.  *See* Letter from Ronald J. Daniels, President, The Johns Hopkins University, to Delegate Luke Clippinger, Chair, House Judiciary Committee (March 20, 2019) (explaining that, under the Act, the City Council must confirm that *the University* "under[took] a community process whereby a

majority of community members support [the Hopkins PD's] presence in their community"); *accord* Hopkins Letter at 2-3 (explaining that "[t]he Act places the burden squarely on Johns Hopkins to develop a legitimate process for obtaining and demonstrating majority support from the affected communities, and confirmation from the City Council that this requirement has been satisfied"). Thus, the University will bear the primary responsibility for measuring community support, while the role of the City Council is to ensure that the University has received sufficient support and has properly measured that support.

As to the specifics of measuring community support, our conclusion above that the term "campus-adjacent communities" means the community areas proposed for Hopkins PD jurisdiction—and not community associations *per se*—leads to the related conclusion that only the members of those particular community areas in which the Hopkins PD would have jurisdiction should be included in the count, not necessarily all members of a larger community association and not merely the leadership of the community association. In other words, a vote of support or opposition from a community association—whose membership may or may not be representative of the membership of a particular community area—is not necessarily a stand-in for the will of the "members of the relevant campus-adjacent communities."[12]

---

[12] Although the University's President at one point testified that Hopkins would only have jurisdiction beyond its campus "with *community organizations* that are welcoming that want us there," *Hearing on S.B. 793 Before the Senate Jud. Proc. Comm.* (Feb. 22, 2019) (emphasis added), that testimony occurred before the bill was amended to require that Hopkins obtain a "majority of support from the *members* of the relevant *campus-adjacent communities*." Amendments to S.B. 793 by the Jud. Proc. Comm.; Senate Proceedings No. 45 (March 13, 2019) (emphasis added). Rather, at the time of President Daniels's testimony, the bill merely provided for off-campus jurisdiction "within areas adjacent to the campus area, as specified in an executed memorandum of understanding developed with input from the relevant community," which would presumably have left room for the University to rely on community organizations, rather than community members, for that input. Since the bill was amended, however, Hopkins has agreed that the language requires it to obtain the support of the members of the community themselves, not the community associations. *See* Hopkins Letter at 4 ("Before the [Hopkins PD's] jurisdictional boundaries may be expanded beyond the 'campus area,' majority community support must

Finally, we note that the requirement that the University "receive[] a majority of support" from the members of the relevant campus-adjacent communities suggests that such support must be affirmatively demonstrated in some way, not based on an "opt-out" method that would measure only active opposition. *Contra* Hopkins Letter at 5 (suggesting that an opt-out method might be appropriate and citing Md. Code Ann., Alc. Bev. § 12-1508(b), which requires the denial of a liquor license application if "more than 50%" of real property owners or tenants "within 200 feet of the location described in the application oppose the issuing of the license"). Otherwise, the Act leaves the City Council with considerable discretion to decide whether, in its judgment, the process used by Hopkins has adequately gauged the support of the relevant campus-adjacent community areas. Of course, because it is up to the City Council to affirm that the University has received the requisite support under the statute, the University might wish to consult with the Council to determine what it would consider to be appropriate and sufficient methods for measuring and demonstrating that support.[13]

### III
### Conclusion

In sum, the "areas adjacent to the campus area" in which the Hopkins PD is to have jurisdiction must be specified in the same MOU between the University and the BPD that establishes the Hopkins PD. In determining those campus-adjacent community

---

be obtained directly 'from the *members* of the relevant campus-adjacent communities' who would be serviced by the [Hopkins PD]." (emphasis in original)).

[13] There are also other questions that the City Council may need to consider in interpreting this requirement. Will community support be measured based on each individual adult who resides in the relevant area or will it be measured by household? *See, e.g*., Baltimore City Code, Article 31, § 10-13 (authorizing a community association or group of residents to petition the Baltimore City Parking Authority to consider a block for participation in the Residential Permit Parking Program if "the association or group" obtains petition signatures "from an adult member of at least 60% of the households on the block face"). Should the owners of businesses within the area be considered members of the community for purposes of gauging support? Neither the text nor the history of the statute provides any clear answers to those questions. Instead, in requiring the City Council to affirm the sufficiency of community support for Hopkins PD jurisdiction, it appears that the Legislature deferred to the City Council on such details, and it is likewise appropriate for us to defer.

areas, Hopkins is not constrained to using the boundaries of official community associations. But the Act's use of the word "adjacent" limits the Hopkins PD's off-campus jurisdiction to areas that are sufficiently close to the campus area, and the use of the word "community" means that support must be obtained from each community within those areas before the Hopkins PD may operate in that community. Hopkins is to take the lead in measuring each community's support in the specific campus-adjacent areas in which it seeks jurisdiction, and it must also demonstrate to the Baltimore City Council that it has received sufficient support. The City Council, in turn, has considerable discretion in determining whether Hopkins has demonstrated that support.

> Brian E. Frosh
> Attorney General of Maryland
>
> Jeffrey P. Hochstetler
> Assistant Attorney General

Patrick B. Hughes
Chief Counsel, Opinions and Advice